**George SCRITCHFIELD and Cynthia Scritchfield, JT Ten/Wros, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**David R. PAOLO and Kenneth Cornell, Defendants.**

No. C.A. 01–550S.

United States District Court, D. Rhode Island.

July 25, 2003.

Barry J. Kusinitz, Esq., Providence, RI, Deborah Clark–Weintraub, Esq., Carlos F. Ramirez, Esq., Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for Plaintiffs.

Jeffrey C. Schreck, Esq., Providence, RI, Greg Shapiro, Esq., Mitchell Kaplan, Esq., Choate, Hall & Stewart, Boston, MA, for Defendants.

### *DECISION AND ORDER*

SMITH, District Judge.

This case requires the Court to determine whether various allegedly fraudulent misrepresentations and omissions made by a company's officers violate the federal securities laws. Plaintiffs George and Cynthia Scritchfield, erstwhile investors in the now defunct Log On America ("LOA") and putative class action representatives,[1]

---

1. Plaintiffs have not yet been certified as a class pursuant to Fed.R.Civ.P. 23. The puta-

tive class is alleged to consist of "all persons who purchased or otherwise acquired the

sue Defendants David R. Paolo and Kenneth Cornell, respectively the chief executive officer and chief financial officer of LOA.[2] Presently before the Court is Defendants' Motion to Dismiss the Amended Complaint. The Court heard oral argument on April 9, 2003, and having considered the parties' positions, the Court finds that while a number of the Plaintiffs' allegations fall short of the mark, Plaintiffs have set forth some claims for which relief may be granted under the heightened pleading standards applicable to securities fraud cases. The Court therefore denies Defendants' motion for the reasons that are discussed in detail below.

## I. *Facts*

Founded by Paolo in 1992, LOA was a Providence, Rhode Island-based Internet access provider for residential and commercial customers. From 1992 to early 1999, LOA grew steadily into a company with nine full-time employees and revenues of just under $760,000. Appendix to Defendants' Motion to Dismiss ("Def.App."), Tab 3.[3]

But with all of the "irrational exuberance"[4] characteristic of telecommunications and Internet startup founders and investors in the 1990s, Defendants had grand plans to "go public," in order to turn LOA into a major telecommunications player. In connection with LOA's initial public offering ("IPO") in April 1999, Defendants filed a prospectus (the "Prospectus") notifying potential investors of various "Risk Factors" relevant to investing in LOA, including: (1) that LOA's revenues in 1998 were only $759,878; (2) that in all of its years of operation, LOA had never made a profit, and, in fact, in 1998 had a net loss of $422,063, which was 51% higher than its net loss the preceding year; (3) that the IPO stock price of $10 was "substantially greater than the net tangible book value of LOA's outstanding common stock"; (4) that as of April 1, 1999, LOA had only nine full-time employees and four part-time employees; (5) that as of April 1, 1999, the CEO of LOA (Paolo) was 31 years old and the CFO (Cornell) was 30 years old; and (6) that LOA faced competition from larger, more experienced, and better funded companies such as Bell Atlantic, America Online, and AT & T. *See* Def.App., Tab 3.

Notwithstanding these warnings, on April 22, 1999 LOA sold 2,530,000 shares of common stock at $10 per share, raising

common stock of Log On America between April 22, 1999 and November 20, 2000, inclusive, who were damaged thereby." Amended Complaint (hereafter "Complaint"), ¶ 19.

**2.** LOA was not named as a defendant because it filed for Chapter 11 bankruptcy protection on July 12, 2002. Complaint, ¶¶ 25, 126. This was converted to a Chapter 7 liquidation shortly thereafter.

**3.** Although its focus is always on the Complaint, the Court may consider "the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996); *In re Colonial*

*Mortgage Bankers Corp.*, 324 F.3d 12, 15 (1st Cir.2003) (in a motion to dismiss for failure to state a claim, court may consider "not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice," including matters of public record). With few exceptions, the documents contained in Defendants' Appendix are all public documents, most of which have been cited to or relied upon in the Complaint. The Court may therefore appropriately consider these in evaluating the case for dismissal.

**4.** Alan Greenspan, *The Challenge of Central Banking in a Democratic Society*, Speech at the Annual Dinner and Francis Boyer Lecture of the American Enterprise Institute for Public Policy Research (Dec. 5, 1996), 1996 WL 698100, *7 (F.R.B.).

approximately $22,450,000.[5] Complaint, ¶ 52. On the first day of trading, LOA's stock price rose as high as $37 per share and closed at $35 per share. *See id.* After going public, LOA used its capital to acquire various New England Internet Service Providers ("ISPs") during the last half of 1999 and early 2000, and grew its customer base from 1,000 to over 30,000. *See id.* at ¶¶ 61, 67, 68, 70, 74, 78, 89, 98.

LOA's rapid expansion increased both its revenues and losses. On November 9, 1999, LOA announced that its net losses for the third quarter of 1999 were $1,338,894, more than a 1,000% increase from the company's net losses in the third quarter of 1998. Def.App., Tab 19. When LOA announced its full-year net losses for 1999 as $5,291,772, LOA's stock price dropped to about $20 per share. *Id.* at Tabs 1, 2, 26.

Then, in 2000, the Internet stock bubble burst. For businesses such as LOA (known as Competitive Local Exchange Carriers or "CLECs"), the average stock price dropped 75%. Def. Tab. 43–44. And LOA was no exception: in 2000 its stock tumbled dramatically, until on November 20, 2000 it bottomed out at $1.50 per share. Complaint, ¶ 122.

Plaintiffs allege that Defendants engaged in "a massive fraudulent scheme to deceive investors into thinking [LOA] was a successful 'dominant' telecommunications company, when in actuality it was not." Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl.Mem.") at 2. This alleged scheme took shape in four ways: (1) misrepresentations concerning LOA's market position and strength relative to its competitors; (2) misrepresentations regarding the size, type and quality of telecommunications

services LOA provided; (3) gross inflation of LOA's customer count and failure to disclose the type of customers it was acquiring; and (4) misstatements of LOA's revenues and earnings. *Id.* The Court will address the facts underlying each of these four subcategories.

### A. *Misrepresentations Concerning LOA's Market Position and Strength*

Plaintiffs first and most essential claim is that Defendants engaged in numerous acts of fraud in a successful effort to deceive investors about the market strength and position of LOA. These acts include alleged misstatements in press releases and interviews to investors that (1) LOA was the "premier provider of high-speed DSL [Digital Subscriber Line] services in the Northeast corridor" (Complaint, ¶ 58); (2) LOA was "a Northeast Regional [CLEC] and Information Internet Service Provider (IISP) providing local dial-tone, in-state toll, long distance, high speed Internet access and cable programming solutions over traditional copper wire using DSL technology to residential and commercial customers through the Northeast" (*Id.*); (3) LOA was "one of New England's leading providers of bundled communications services" (*Id.* at ¶ 74); (4) LOA was "a rapidly growing [CLEC] providing [DSL] and integrated communications solutions in the Northeast" (*Id.* at ¶ 78); (5) LOA was "in a dominant position in the market for integrated data and voice services" (*Id.* at ¶ 86); (6) LOA was "a dominant super regional communications player" (*Id.* at ¶ 89); (7) LOA was "a rapidly growing switched facilities-based D–CLEC + providing broadband communica-

---

**5.** Defendants contend that they never capitalized on LOA's transitory wealth, however, because they never sold any of their LOA stock.

tions and data services to the commercial and small office/home office ['SOHO'] markets" (*Id.* at ¶ 100); and (8) LOA was a company that had evolved from a simple ISP into "an organization that provides enhanced broadband telecommunications services to small and medium businesses as well as the SOHO market." (*Id.* at ¶ 109).

### B. *Misrepresentations Regarding Type of Telecommunications Services Provided*

Second, Plaintiffs claim that in April 1999, the only service LOA provided was access to the Internet primarily through dial-up service. Complaint, ¶ 26. Since it wanted to expand its services, LOA obtained approval in October 1998 to become a CLEC in Rhode Island. *Id.* At the time of its IPO, Plaintiffs maintain that the Prospectus stated that LOA's goal was to grow its base of commercial customers through acquisitions and direct marketing. *Id.* at ¶ 27. Plaintiffs claim that Defendants never reached this goal, and that, "rather than admit [their] failings," Defendants represented that LOA was a "leading provider" of "bundled" communications services in the Northeast, which was false. Pl. Mem. at 3.

Plaintiffs also allege that after the IPO, LOA went on a "buying spree," unwisely using inflated LOA stock to purchase five ISPs (which Plaintiffs believe sold primarily dial-up access) and acquiring more than 30,000 additional customers. Complaint, ¶ 42. LOA issued press releases with the acquisition of each of the ISPs, which Plaintiffs claim falsely touted the acquired ISPs as bringing capabilities (such as high speed DSL and local voice services) to LOA. Pl. Mem. at 3; Complaint, ¶¶ 60–61, 69. Subsequent to these acquisitions, Plaintiffs claim that they conducted an investigation that revealed that LOA was unable to offer "bundled" telecommunications services, and that LOA "made no meaningful progress" with respect to its stated goals. *Id.* at ¶ 43. Nevertheless, LOA continued to issue press releases stating that LOA was able to offer services to its customers that it allegedly could not offer.

One of the subjects of alleged fraud in this subcategory relates to the purchase by LOA of certain "switching" equipment from Nortel Networks.[6] Plaintiffs allege that although this purchase occurred, LOA was unable to use the equipment to achieve its stated purpose, but nevertheless touted the equipment to its investors. *Id.* at ¶ 44, 58. Plaintiffs proffer the testimony of several anonymous former LOA employees[7] who claim that the Nortel switch never became operational (although at one point it "went live"), despite LOA's public statements to the contrary. *Id.* at ¶¶ 45, 115(c). By May 2000, the relationship between Nortel and LOA had become

---

6. This switching equipment would have enabled LOA to convert its infrastructure to incorporate the newly acquired ISPs and provide "bundled" telecommunications services.

7. The use of anonymous sources in this context is not without precedent. *See, e.g., In re Cabletron Systems, Inc.,* 311 F.3d 11, 29 (1st Cir.2002); *In re Allaire Corp. Securities Litigation,* 224 F.Supp.2d 319, 325–26 (D.Mass. 2002):

 [T]he "pleading with particularity" requirement of identifying the source applies to

fraudulent statements and statements based on information and belief, not to the underlying facts supporting the inference that the statement was fraudulent.... [E]ven if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

strained, but LOA and its principals did not make this known to investors. *Id.* at ¶ 44.

### C. *Inflation of LOA's Customer Count*

In the third subcategory of alleged fraud, Plaintiffs allege that Defendants emphasized a focus on commercial customers in LOA's IPO Prospectus, but "[c]ontrary to defendants' public statements, [LOA] did not acquire or maintain 'high revenue, high margin commercial customers' nor did it 'evolve' from an ISP into 'an organization that provide[d] enhanced broadband telecommunications services to small and medium businesses as well as the [SOHO] market.'" Pl. Mem. at 6–7. Plaintiffs allege that the customers, both for Internet and telephone, generated by LOA's acquisitions after the IPO were residential, not commercial, but that Defendants did not disclose this. Complaint, ¶¶ 29, 42. Defendants also are alleged to have mischaracterized these new residential customers as SOHO customers in their public statements, in order to attract investors. Pl. Mem. at 7. Furthermore, Defendants are alleged to have inflated LOA's customer count, improperly including delinquent accounts and subscriber accounts no longer active. Complaint, ¶ 31.

### D. *Inflation of LOA's Revenues and Earnings*

In the final subcategory of alleged fraud, Plaintiffs allege that Defendants issued press releases and SEC filings, after the IPO, falsely reporting record earnings. Plaintiffs claim that Defendants did not disclose the "numerous ways in which LOA's revenues were fraudulently misstated," including (1) widespread billing errors that were known to, or recklessly disregarded by, Defendants; (2) Defendants' refusal to write off bad debts; and (3) Defendants' failure to establish an appropriate reserve for bad debts. Pl. Mem. at 9; Complaint, ¶¶ 33–41. Again, Plaintiffs reference the statements of various anonymous erstwhile employees of LOA to support these claims. *Id.* at ¶¶ 33–41.

On November 20, 2000, Plaintiffs allege that "the truth beg[an] to emerge" when LOA reported a third quarter net loss of $7.03 million, compared with a loss of $1.56 million for the year before. *Id.* at ¶ 121. Plaintiffs set forth two Counts in the Complaint: (I) Count I: violation of Section 10(b) of the Securities and Exchange Act (the "Act") and Rule 10b–5 thereunder; and (II) Count II: violation of Section 20(a) of the Act.[8]

### II. *Analysis*

Before turning to an analysis of the adequacy of the Plaintiffs' claims, some discussion of the framework for evaluating motions to dismiss in securities fraud actions is in order.

### A. *The Basics: Elements of a Securities Fraud Action*

Section 10(b) of the Act and Rule 10b–5 of the regulations promulgated thereunder prohibit any person, directly or indirectly, from committing fraud in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b);[9] 17 C.F.R. § 240.10b–5.[10]

---

**8.** The viability of Count II depends entirely on the success or failure of Count I, because Section 20 requires a violation of Section 10(b) and further requires that the Defendants be found "controlling persons," within the meaning of the Act, over LOA.

**9.** The pertinent portion of the statute reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security . . . any

To state a claim for securities fraud under these sections, a plaintiff must plead, with sufficient detail to satisfy Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), that a defendant (1) made a false statement or an omission, (2) which was material, (3) with the requisite *scienter*, and (4) that the plaintiff's justifiable reliance on this statement caused the plaintiff's injury. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–43, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996).[11]

### 1. *Materiality*

Once a plaintiff has alleged that a representation is untrue, whether the statement is "material" under § 10(b) is determined under the "reasonable investor" standard: *i.e.*, the question asked is whether a reasonable investor would have viewed the nonpublic information as "having significantly altered the total mix of information made available" to those making the in-

> manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> 15 U.S.C. § 78j.

**10.** 17 C.F.R. § 240.10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

vestment decision. *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978. The issue of materiality is generally one that is left for the trier of fact. *See Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170, 176 (1st Cir.1994).

However, the fact that a corporation is in possession of material nonpublic information is not enough to sustain a § 10(b) claim. No matter how "material" undisclosed information might be, the securities laws are not implicated unless there was first a duty to disclose this information. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996). A duty to disclose arises when a corporation has previously made a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information. *See id.* at 992; *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir.1987) ("When a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate.").

**11.** Stated in a more dissected way, a plaintiff must prove the following 5 elements:

> (1) the defendant used a means of interstate commerce or the mails;
>
> (2) the defendant either:
>
> (a) employed a device, scheme, or artifice to defraud, or
>
> (b) made an untrue statement of a material fact, or omitted to state a material fact which made what was said, under the circumstances, misleading, or
>
> (c) engaged in a fraudulent act, practice or course of business;
>
> (3) the defendant acted knowingly, and with the intent to defraud or with reckless disregard as to whether it would mislead plaintiff;
>
> (4) the plaintiff justifiably relied on the defendant's statements or omissions; and
>
> (5) the defendant's conduct caused injury to the plaintiffs.
>
> *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5; *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978).

## 2. Scienter

"[T]he courts of this Circuit ... require a securities plaintiff 'to allege facts that give rise to a strong inference of fraudulent intent.'" *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 275 (D.Mass.1998) (citing *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997) (citations and internal quotation marks omitted)); 15 U.S.C. § 78u–4(b)(2). A securities fraud plaintiff must therefore allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992).

## B. Standard of Review

In a securities fraud action, the standard of review prescribed by Fed.R.Civ.P. 12(b) is augmented by Fed.R.Civ.P. 9(b) and the PSLRA. Rule 9(b) imposes a stringent pleading requirement on plaintiffs alleging fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). The PSLRA makes the pleading standard in securities fraud cases even more exacting. Under the PSLRA a complaint alleging securities fraud must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

The First Circuit has "been especially rigorous in demanding such factual support in the securities context...." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991). To support an allegation of fraud in this context, pleadings must go beyond mere information and belief to specify the source of the information and the reasons for the belief. *See id.* at 878; *New England Data Servs. v. Becher*, 829 F.2d 286, 288 (1st Cir.1987). A complaint alleging securities fraud must specify (1) the statements that the plaintiff contends were fraudulent, (2) the identity of the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent. *See Suna*, 107 F.3d at 68 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127–28 (2nd Cir.1994)).

## C. The Defendants' Motion

Defendants advance four primary contentions supporting dismissal: (1) None of the alleged misrepresentations is actionable; (2) LOA's stock price movements demonstrate that the alleged misrepresentations were not material; (3) the Complaint does not adequately plead *scienter;* and (4) Plaintiffs' Section 20(a) claim should be dismissed because they have not pled a Section 10(b) claim.

### 1. Are the Alleged Misrepresentations Actionable?

As an initial matter, in order to be actionable as a securities fraud violation, a misrepresentation must be (1) untrue, and (2) material. An omission (since it cannot be untrue) rises to actionable levels if it is material. Finally, in either case, the party misrepresenting or omitting a material fact must also be bound by a duty of disclosure. If, applying the armamentarium of pleading standards set forth *supra*, the Court finds that Plaintiffs' allegations meet these elements, then their securities fraud claim survives Defendants' "actionability" challenge.[12] The Complaint is divi-

---

12. Of course, if the Plaintiffs' claims are found to be actionable, Plaintiffs must also allege *scienter* and reasonable reliance suffi-

sible into several discrete categories of alleged fraudulent misrepresentation and omission; the Court will review each such category against the rigorous standards outlined above.

a. *Alleged Misrepresentations Concerning LOA's Overall Market Position*

The primary subset of alleged fraud concerns statements describing LOA's general market status throughout the relevant time period. As set forth earlier, Defendants variously described LOA as the "premier provider of high-speed DSL services in the Northeast corridor," "one of New England's leading providers of bundled communications services," "in a dominant position in the market for integrated data and voice services," and "a dominant super regional communications player."

Defendants do not dispute that they characterized LOA in these ways. Rather, they raise the so-called "puffery" defense, contending that their "rosy statements about LOA's general performance and prospects cannot have been material" to the reasonable investor.[13] Defendants' Memorandum in Support of Their Motion to Dismiss ("Def.Mem.") at 19.

Puffery has been defined as "exaggerated, vague, or loosely optimistic statements about a company...." *In re Boston Technology, Inc. Securities Litigation,* 8 F.Supp.2d 43, 54 (D.Mass.1998) (citing *Summa Four,* 93 F.3d at 995). "Vague predictions" about a company's prospects are not actionable. *Id.* (citing *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 211 (D.Mass.1993) ("Prospects for long term growth are bright."); *Shaw,* 82 F.3d at 1219 (statement that things were "[currently] going reasonably well" and statement that the company "should show progress [in the future]" both ruled immaterial)). The puffery exemption may apply both to an "issuer's *current* state of affairs and its *future* prospects." *In re Boston Technology,* 8 F.Supp.2d at 54 (emphasis in original).[14]

Notwithstanding these general pronouncements, the line of demarcation between puffery and actionable misstatement is often less than pellucid. *See, e.g., Greebel v. FTP Software, Inc.,* 194 F.3d 185, 206–07 (1st Cir.1999) ("upbeat statements of optimism," commenting on the company's "excellent performance," "increased" sales, or that its ventures were off to a "good start" were not actionable); *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 419 (5th Cir.2001) (defendants' statements that drug was a "fast acting," "improved formulation" were not actionable); *Novak v. Kasaks,* 216 F.3d 300, 315 (2nd Cir.2000)

---

ciently. If the claims are not actionable, then the Court need not address these issues.

**13.** In keeping with the framework outlined above, the Court notes that interposing the puffery defense is tantamount to conceding that the offending statements were technically inaccurate; the puffery defense is a challenge to the materiality of those misstatements.

**14.** The PSLRA arguably codifies the puffery defense:

(c) Safe harbor

(1) In general

[I]n any private action arising under this subchapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person ... shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward looking statement is—...

(ii) immaterial[.]

15 U.S.C. §§ 77z–2(c)(1)(A)(ii); 78u–5(c)(1)(A)(ii). However, the PSLRA does not explicitly define "immateriality," *see* 15 U.S.C. § 77z–2(*i*), so that a party seeking to use this defense must rely on the case law that discusses "materiality," some of which deals with the puffery defense.

(statements that inventory situation was "in good shape" and "under control," when defendants knew the opposite to be true, were actionable); *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684–85 (4th Cir.1999) (corporation's public statements that it provided its employees with job security, good working conditions, and "some of the best benefits in the supermarket industry," its statements about the cleanliness of its stores, and its statements expressing belief that it was one of the best-managed high growth operators in the food retailing industry were all immaterial puffery); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746–47 (7th Cir.1997) (Posner, C.J.) (characterizing the puffery inquiry as "whether [a company] said things that were so discordant with reality that they would induce a reasonable investor to buy the stock at a higher price than it was worth *ex ante* [,]" and holding that the defendant company's statements that the bidding process in an auction for the sale of the company was "continu[ing] to go very well" and "very smoothly" were not actionable); *Kafenbaum v. GTECH Holdings Corp.*, 217 F.Supp.2d 238, 250 (D.R.I.2002) (statements that a company is "on course to restore growth in the business ...," and that the company "remains confident that our business is sound" are not actionable); *Manavazian v. Atec Group, Inc.*, 160 F.Supp.2d 468, 480 (E.D.N.Y.2001) (statements that a company's business scheme was a "framework" for "organic growth" and the "blueprint" for "hyper-growth," that the company was "poised for future growth," and that it occupied a "strategic position in the technology industry" were actionable because at the time defendants made these statements, defendants were aware that a "paradigm shift" in the industry had "hobbl[ed] the [c]ompany's basic health"); *In re Splash Technology Holdings Inc. Securities Litigation*, 160 F.Supp.2d 1059, 1077 (N.D.Cal.2001) (statements using the words "healthy," "strong," "increased awareness," "robust," "well positioned," "solid," "improved," "better than expected," and "unfolding as planned" were all deemed puffery and not actionable); *Schaffer v. Timberland Co.*, 924 F.Supp. 1298, 1314 (D.N.H.1996) ("Given the caselaw, it is apparent that in many situations there is no standard by which a court can readily distinguish between actionable predictions and vague optimism or puffery.").[15]

Judge Young of the District of Massachusetts recently has written extensively

---

15. The recent revitalization of the puffery defense (whose germ may be located in the doctrine of *caveat emptor*) has been bemoaned by some. *See, e.g.*, Jennifer O'Hare, *The Resurrection of the Dodo: The Unfortunate Re-Emergence of the Puffery Defense in Private Securities Fraud*, 59 Ohio St. L.J. 1697 (1999); 7 Louis Loss & Joel Seligman, *Securities Regulation* 3424 (3rd ed. rev.2003) ("[A]las, however, the puffing concept in the securities context, which for decades had all but gone the way of the dodo, has recently experienced a revival."). But puffery (and, therefore, its defense) may also serve benignant social ends. *See generally* Richard A. Posner, *Law, Pragmatism, and Democracy* 54 (Harvard Univ. Press 2003) ("Think of the amount of puffery in advertising. Advertisers describe their product as the best there is and pretend to an altruistic concern with the consumer's welfare, yet there is a strong consilience between commercial and pragmatic values; so here, at the very heart of American culture, we find piety and pragmatism comfortably coexisting.... Because there is *some* truth to our hyperbolic, aspirational, self-congratulatory ... rhetoric, we would find total realism deflating and in a sense misleading.") (emphasis in original). Of course, this view discounts the moral opprobrium traditionally reserved for perpetrators of fraudulent acts, no matter how socially useful their ends may be. *See, e.g.*, Dante Alighieri, *La Divina Commedia—Inferno, Canto XI*, (La Nuova Italia 3d ed. 1985) ("But because fraud is man's peculiar vice,/ The more it displeases God; and so stand lowest / The Fraudulent, and greater agony assails them.").

on the puffery defense. In *In re Number Nine Visual Technology Corp. Securities Litigation*, 51 F.Supp.2d 1 (D.Mass.1999), Judge Young applied a useful two-step test to determine whether or not a statement is puffery: "first, the court should evaluate whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information; second, the court should ask whether the statement was also considered unimportant to the total mix of information by the market as a whole." *Id.* at 20 (citing R. Gregory Roussel, Note, *Securities Fraud or Mere Puffery: Refinement of the Corporate Puffery Defense*, 51 Vand. L.Rev. 1049, 1064–66 (1998) (discussing the virtues of the "contextual standard," as distinguished from other bright-line standards, in assessing whether a statement should be classified as puffery)). In concluding that the defendant company's statement of its "broad product line" was non-actionable puffing, the court wrote:

> Number Nine's "broad product line" statement is ... "puffing or sales talk upon which no reasonable person could rely...." Notably, the Class does not challenge any of the specific factual assertions made in the "broad product line" statement; that is, the Class does not challenge that Number Nine offered products for the high-end and mainstream customer, or that it offered products at prices ranging from $150 to $2,000. Instead, the Class' only quibble with the statement is the *implicit* meaning that they attribute to the phrase "broad product line." The Court holds, however, that the phrase is incapable of supporting such an inference, as any reasonable investor would recognize the phrase simply as bullish corporate grandstanding.

*Id.* at 20–21 (internal citations omitted) (emphasis in original). *Number Nine*

therefore stands for the necessity of a highly contextualized analysis of each allegedly fraudulent statement, and minimizes the relevance of meanings that might be inferred solely from the challenged language itself.

Next, in *In re Peritus Software Services, Inc. Securities Litigation*, 52 F.Supp.2d 211 (D.Mass.1999), Judge Young determined that the phrases "unprecedented market demand," and "[w]e ... are extremely proud of our success and our focus on near and long term opportunities in the software evolution market," when analyzed in context,

> represent[ ] precisely the type of "rosy affirmation" which the First Circuit has held to be mere corporate puffery.... In this case, Peritus was announcing the availability of a new type of service that it could offer clients. Citing an "unprecedented market demand" for Peritus offerings was simply part and parcel of the standard corporate hyperbole that accompanies any new product or service announcement....
>
> [Similarly,] [n]o reasonable investor would take a statement that corporate executives were "proud" of their accomplishments as anything more than a wholly *subjective* view. As such, the statement cannot have been material under any sensible analysis of corporate prospects....

*Id.* at 220 (internal citations omitted) (emphasis in original). The contribution of *Peritus* is its emphasis on the *objectively* reasonable inferences, once again supported by context, that can be drawn from the challenged language; statements that only evince subjective beliefs or opinions are not actionable.

*In re Allaire Corporation Securities Litigation*, 224 F.Supp.2d 319 (D.Mass. 2002), is arguably the most instructive

guidepost in understanding the contours and scope of the puffery defense. There, several allegedly fraudulent statements were measured against the puffery defense. The statement that the subject company's performance "exceeded our expectations" was deemed puffery, while the statement that "Spectra [the company's new product] was fueling growth" was actionable, because it was "a precise statement as to the basis for profit growth...." *Id.* at 331–32. The statement that "[m]ajor [companies] ... are standardizing on the [Spectra] platform to bring their business to the web *faster than ever before*" (emphasis in original) was held to be more than puffery, because it

> asserts that the platform will bring their business to the web faster than ever before. In *Number Nine,* 51 F.Supp.2d at 18, this Court noted that when a company initiates a comparison with other companies' products, it must fully disclose.... Here, exactly such a comparison was made or implied. "Faster than ever before" clearly indicates that this product is faster than any previously available product. Accordingly, in the motion to dismiss context, this constitutes an actionable statement.

*Id.* at 332. Likewise, the court held the statement, "Spectra customers have 'gone live' and brought their businesses to the Web faster and more cost effectively than ever before," to be actionable, because

> the use of "faster than ever before" is an implied comparison with every product previously available, as is "more cost effectively"; thus, these portions of the statement are not puffery....

*Id.* at 336. *Allaire* continues to emphasize the context within which a statement is made, and focuses on a careful (and often rather subtle) scrutiny of the challenged words themselves, in an attempt to decide whether they may be read as conveying a comparative connotation.

This Court finds persuasive and adopts the analytical framework set forth in *Number Nine, Peritus,* and *Allaire,* and will apply it to the challenged statements involved in this action. The representation that LOA was the *"premier* provider of high-speed DSL services in the Northeast corridor," as it was described in a May 17, 1999 press release, Def.App., Tab 5, is much more than mere puffery: it is a statement of LOA's present status and capabilities, and connotes that LOA is comparatively superior to all other high-speed DSL service providers in the Northeast corridor. Likewise, the statements that LOA's transaction with Nortel would "help further solidify [LOA's] *dominant* position in the market for integrated data and voice services," Def.App., Ex. 20, and that LOA's "proven early market entry strategy is positioning it as a *dominant* super regional communications player," Def.App., Tab 22, are both actionable: they clearly imply a comparison to competitors and suggest that activities undertaken by LOA as of December 17, 1999 or February 10, 2000 had made or were making it "dominant" over all other competitors in its field. The same is true for the statement that, by October 28, 1999, LOA had become "one of New England's leading providers of bundled communications services." Def.App., Tab 15. Assuming that the substance of the statement is untrue (as Plaintiffs have alleged, and as Defendants have conceded for purposes of this motion), this statement is material, as it connotes superiority over the vast majority of other bundled communications services providers.

The contextual approach to assessing the applicability of the puffery defense set forth in the *Number Nine–Peritus–Allaire* line of cases makes clear that a company's

statements that it is "premier," "dominant," or "leading" must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery); this *deus ex machina* approach is plainly insufficient. The statements are properly interpreted only by reference to the relevant circumstances that underlie their meaning.

### b. Alleged Misrepresentations in the Prospectus Concerning LOA's Status

Defendants next contend that the Complaint does not reveal any allegations "contradicting the truthfulness of the disclosures actually made in the IPO." Def. Mem. at 8.

As respects the Prospectus itself and the alleged misrepresentations made therein, Plaintiffs complain that, despite Defendants' representations to the contrary, LOA was not able to provide a "wide range" of Internet and cable services at the time of the IPO, nor was it able to offer "bundled" telecommunications services. Complaint, ¶ 57(a), (c) and (d).[16] But a careful reader of the Prospectus would not misapprehend the statements contained therein, as Plaintiffs have. The Prospectus states:

> In October 1998, we [LOA] were approved as a [CLEC] in the State of Rhode Island. A [CLEC] is a company that provides local access lines as opposed to long-distance or other services. This allows us to send a telephone line into a home or business and *enables*[17] us to provide a full range of telecommunications services to our customers, such as Internet, voice data and cable programming.

Def.App., Tab 3 at 16 (emphasis supplied). Nothing in this statement can be characterized as fraudulent or misleading. In fact, it is true that CLEC status empowers a company to offer the range of services listed. Furthermore, other statements in the Prospectus clearly differentiate between the services LOA was providing at the time of the IPO, as opposed to those services which it was LOA's *future intention* to provide:

> As an [ISP], *we currently provide* a variety of Internet solutions to both commercial and residential customers. As a local exchange carrier, *we plan to offer* a full range of local telecommunication services.... *Our plan* is to initiate an acquisition campaign targeting Internet service providers. *We currently do not have* any plans or agreements regarding any potential acquisitions.... The following list summarizes and defines the specific products and services which *we currently offer* .... *We intend to use* this local exchange status to provide our Rhode Island customers ...

---

16. The Court does not pause long to discuss Plaintiffs' allegation that "there was no reasonable basis to believe that LOA could profitably resell Verizon phone service to customers at competitive rates," Complaint, ¶ 57(c), since Plaintiffs have not identified any instance in which Defendants made a representation about their ability to resell Verizon phone service at a profit. The claim that Defendants actually did resell Verizon phone service at a loss, even if believed, is irrelevant insofar as it does not necessarily involve a material misrepresentation or omission.

17. Plaintiffs misquote this paragraph of the Prospectus in the Complaint—specifically, they substitute "enabled" for the original "enables." Complaint, ¶ 53. Obviously, this change in verb tense bears directly upon Plaintiffs' charge that the Prospectus misrepresented LOA's capabilities at the time it was issued. The Court assumes that this was a typographical error rather than an intentional one.

with typical phone service such as dial tone, toll calls/in-state long distance, long distance, as well as high-speed Internet access. *We intend to become* a full service provider of local telecommunications services....

*Id.* at Tab 3 *passim* (emphasis supplied).

Moreover, in addition to the extensive "Risk Factors" enumerated, the Prospectus contains the following prominent warning:

> The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our financial statements, the notes to our financial statements and the other financial information contained elsewhere in this prospectus. In addition to the historical information, this Management Discussion and Analysis of Financial Condition and Results of Operations and other parts of this prospectus contain forward-looking information that involve [sic] risks and uncertainties. Our actual results could differ materially from those anticipated by the forward-looking information as a result of certain factors, including, but not limited to, those set forth under "Risk Factors" and elsewhere in this prospectus.

Def.App., Tab 3, at 16.

A variation of this warning also precedes the section entitled "Risk Factors:"

> You should carefully consider the following factors and other information in this prospectus before deciding to invest in shares of our common stock. This prospectus contains forward-looking statements which can be identified by the use of words such as "intend," "anticipate," "believe," "estimate," "project," or "expect" or other similar statements. These statements discuss future expectations, contain projections of results of operations or of financial condition, or state other "forward-looking" informa-

tion. When considering these statements, you should keep in mind the risk factors described below and other cautionary statements in this prospectus. The risk factors described below and other factors noted throughout this prospectus, including certain risks and uncertainties, could cause our actual results to differ from those contained in any forward-looking statement.

*Id.* at 6.

It is precisely this type of "forward-looking" statement which forms the basis for Plaintiffs' allegations of fraud in the Prospectus. The PSLRA explicitly exempts this type of statement from liability in its "safe harbor" provisions:

> (c) Safe Harbor
>
> (1) In general
>
> [I]n any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person ... shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> (A) the forward looking statement is—
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement....

15 U.S.C. §§ 77z–2(c)(1)(A)(i); 78u–5(c)(1)(A)(i).

Moreover, the caselaw makes clear that statements in an IPO prospectus regarding the potential to increase a company's profits are not actionable as securities fraud when they are modified by another statement that "bespeaks caution." *See Number Nine,* 51 F.Supp.2d at 21–22 (" '[I]f a statement is couched in or accom-

panied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law.' ") (citing *Shaw*, 82 F.3d at 1213); *Fitzer v. Security Dynamics Techs., Inc.*, 119 F.Supp.2d 12, 31 (D.Mass.2000) (Young, C.J.) (in the context of a prospectus, "[t]he 'bespeaks caution' doctrine stands for the principle that when statements such as forecasts, estimates, opinions, or projections are accompanied by cautionary disclosures that adequately warn of the possibility that actual results or events may turn out differently, these so-called 'soft' statements may not be materially misleading under the securities laws.").

Here, Defendants were careful in the Prospectus to caution putative investors of a whole host of risks that attended investing in LOA, accompanied by prominent and straightforward warnings discounting the weight of phrases (used *ad nauseam* throughout the Prospectus) such as "intend," "anticipate," "believe," "estimate," "project," or "expect." These statements are not actionable as securities fraud.

c. *Alleged Misrepresentations Concerning the Type—Commercial, SOHO or Residential—of LOA's Customers*

■ Defendants next contend that they never misrepresented that LOA's customer base was primarily commercial. This family of alleged misrepresentation comprises Defendants' statements throughout the period that they were acquiring ISPs after the IPO. Plaintiffs claim that "[m]ost of the Internet customers obtained through acquisitions of ISPs ... were residential customers," not commercial or SOHO customers. Complaint, ¶ 29.

Plaintiffs also allege that LOA's telephone customers (as distinguished from its Internet customers), which it began to acquire at least one year after the IPO, were primarily residential. *Id.* at ¶ 30.

Plaintiffs do not dispute, however, that some portion of LOA's customer base, both before and after the IPO, was commercial. The Complaint itself acknowledges repeatedly that LOA represented that it offered and was planning to offer telecommunications services "to residential and commercial clients" or to "business and residential clients." *See* Complaint, ¶¶ 65, 67, 72, 74, 78. Nevertheless, Plaintiffs argue that "Defendants were not targeting commercial customers and, in fact, its [sic] customer base was *primarily* residential in nature." *Id.* at ¶ 69(a) (emphasis supplied); see also ¶ 79(b) ("[LOA] had not been successful in penetrating the commercial market.").

Even if the Court accepts the allegation that "almost all" or the "vast majority" of LOA's customers were residential, (Pl. Mem. at 18–19), rather than commercial, it does not discern any conduct with respect to this category of alleged misstatement that contravenes the Act. Plaintiffs argue that "[t]he federal securities laws require much more honesty" than that of the statements in this record. Pl. Mem. at 19. No proposition of law buttresses this flourish of indignation. While it is reluctant to engage in legal rhabdomancy, the Court believes that Plaintiffs rely on the proposition (later articulated in their brief) that "once a company makes a disclosure, it is under a duty to make the disclosure *complete and not misleading*." Pl. Mem. at 20 (emphasis in original) (citing *Lucia*, 36 F.3d at 175; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560–61 (6th Cir.2001)).

*Lucia* was a section 10(b) securities fraud action involving investments in companies that offered a diversified portfolio

of "junk bonds"—high yield fixed-income securities—the market for which plummeted after the investing public became aware that their default rate was considerably higher than initially believed. 36 F.3d at 172. Plaintiffs, purchasers of junk bonds, alleged that the defendant companies' directors utilized a misleading statistical comparison in their prospectuses to portray the historic performance of junk bonds: in the ten years surveyed, the data indicated that junk bonds outperformed Treasury securities. *Id.* Plaintiffs claimed, however, that in the six years leading up to the Defendants' public offerings, Treasury securities outperformed junk bonds, a fact which Defendants had not disclosed. *Id.* at 173.

In concluding that this particular omission was material, the First Circuit first repeated the familiar refrain that information is material "only if its disclosure would alter the '*total mix*' of facts available to the investor and 'if there is a *substantial likelihood* that a reasonable shareholder would consider it important' to the investment decision." *Id.* at 175 (citations omitted) (emphasis in original). Furthermore, the court noted that a statement's literal truth cannot in all circumstances shield it from actionability: "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Id.* Such was the case in the circumstances of *Lucia:*

> We begin by noting that the six years at issue are the six years leading up to the fund's public offering. Moreover, while any one or two years might favor Treasury securities without amounting to an unfavorable trend, we think that a six-year comparison favoring Treasury securities is substantial enough to cast some doubt on the reliability of the re-

ported ten-year figure. In other words, we cannot say as a matter of law that the undisclosed information about the six-year period would not alter the total mix of facts available to the investor.

*Id.* at 176. The central point in *Lucia,* therefore, was that a jury might have found that the omission of this crucial information reflecting the performance of junk bonds in the six years immediately preceding the public offering was substantially likely to have been considered important by an investor.

The same cannot be said with respect to the alleged misrepresentations and omissions about LOA's customer base or the type of customer it was pursuing. As an initial matter, Plaintiffs' allegations of fraud in this area rely on a selective and truncated reading of the language that is challenged. For example, LOA's August 12, 1999 Form 10 QSB states, in relevant part:

> *Our goal* is to become a leading provider of a wide range of Internet, voice, data, video, and cable programming in the Northeast. *To accomplish this goal, we intend to develop, utilize and package our services for the residential and commercial marketplace* at competitive prices.

> To date, we have focused our efforts on high revenue, high margin commercial clients which enter into term contracts for service, generally 12 months in duration. *We intend to utilize these relationships* and begin cross-selling additional services as we roll out our high speed DSL backbone. *We will utilize* this backbone to offer high margin, value added telecommunications services under one unified bill. We rely on service and performance to attract and retain our customers . . . .

Def.App., Tab 10 (emphasis supplied).[18] The cited paragraphs appear immediately below a clearly visible "bespeaks caution" statement of the type discussed earlier, warning the reader "not to place undue reliance on [the] forward-looking statements" that follow it. *Id.*

Just as in the Prospectus, the "total mix" of the information provided here simply cannot be viewed as misleading. Any reasonable investor would recognize the totality of these statements as hortative— not as statements of present fact: LOA, barely four months after its public offering, framed its entire discussion in aspirational terms, frequently using the future tense and words such as "goal," "intend," "become," and "develop."

A survey of Plaintiffs' specific charges regarding these Form 10–QSB statements (at Complaint, ¶ 66(c), (e) and (f)) illustrates their legal insufficiency. First, Plaintiffs claim that "[LOA] *was not obtaining* 'high revenue, high margin' commercial clients." *Id.* at ¶ 66(c) (emphasis supplied). But that is not what is stated in the Form 10–QSB, which reads: "To date, *we have focused* our efforts on high revenue, high margin commercial clients." (emphasis supplied). Even if that statement is taken entirely out of context (as it should not be for purposes of this analysis), the fact that LOA had not actually obtained commercial customers at the time the statement was made does not logically compel the conclusion that Defendants were lying when they said that LOA had focused its efforts on acquiring commercial customers. *See Eisenstadt,* 113 F.3d at 746 ("Hindsight is not the test for securities fraud.").

Next, in paragraph 66(e) of the Complaint, Plaintiffs claim that "LOA had no ability to provide customers with a 'unified bill[.]'" This allegation, once again, mischaracterizes the challenged statement: "We will utilize this backbone to offer high margin, value added telecommunications services under one unified bill." This is a forward-looking statement, not a description of LOA's present capabilities. It is therefore not actionable.

Paragraph 66(f) alleges that "LOA's services and customer care were seriously flawed and substandard and could not be relied upon to attract customers," which ostensibly questions the veracity of the statement: "We rely on service and performance to attract and retain our customers." This statement is not actionable. All that this statement stands for is the unchallenged proposition that LOA *relies* on its service and performance; it is not a judgment about the quality of that service and performance. Therefore, the allegation that LOA's service and performance are flawed and substandard, even if believed, does not render the statement fraudulent.

Each allegation of fraud relating to the type of customer LOA had acquired or intended to pursue suffers from the same fundamental legal defects—they are simply not actionable.[19] Plaintiffs illuminate

---

**18.** Plaintiffs cite only the second of these two paragraphs from the August 12, 1999 Form 10–QSB. *See* Complaint, ¶ 65. Of course, ripping this passage away from its context may serve Plaintiffs' ends, but it is not at all indicative of the "total mix" of information in the Form 10–QSB available to the investor.

**19.** *See, e.g.,* (1) Complaint, ¶ 69(a): "Defendants were not targeting commercial customers and, in fact, its [sic] customer base was primarily residential in nature." The allegedly fraudulent statements are that "[t]he addition of UcoNects [sic] commercial customer base compliments [sic] our strategy to provide enhanced telecommunications services for *business and residential clients* throughout the Northeast corridor," (emphasis supplied) and that the acquisition of UcoNects and NetQuarters, Inc. "increases our

their own allegational shortcomings, symptomatic of the infirmities afflicting this entire family of pleading, when they state: "Contrary to [LOA's] stated intent, the customers it had acquired were largely residential, not commercial." Complaint, ¶ 94(b). That LOA ultimately may have been unable to realize its dreams cannot transmogrify hopeful predictions into fraudulent dictions.

### d. Alleged Misrepresentations Concerning the Quality and Quantity of LOA's Customers

Plaintiffs allege repeatedly that Defendants' public statements mischaracterized the socioeconomic status of LOA's Internet and telephone customers and improperly inflated LOA's counts of its Internet and telephone customers.

The first challenged statement appears in an October 28, 1999 press release issued by LOA: "The acquisitions [of Twisted–Pair Networks, NetQuarters, and Uco-Nects] expand [LOA's] business and resi-

dential base to 30,000." Def.App., Tab 15. The acquisitions of these companies brought additional Internet customers to LOA, and, as Defendants point out, Plaintiffs have explicitly stated as much in the Complaint. See Complaint, ¶ 42 ("During the Class Period, LOA acquired some or all of the business of several other ISPs ... growing its customer base to more than 30,0000 [sic] Internet subscribers."). This statement is not actionable because it is true.

■ The second challenged statement appears in a February 29, 2000 press release issued by LOA: "During the year, we completed the first phase of our growth plan, the acquisition phase, which established a critical mass of customers throughout the New England states." Def.App., Tab 25. Plaintiffs object to the phrase "critical mass." Complaint, ¶ 94(b). The phrase is non-actionable puffery, just as the hypothetical claim that LOA had acquired "a lot" of customers would be puffery. These are purely subjective, unverifiable descriptions of the number of

base of clients to cross-sell enhanced telecommunications services." These statements are not actionable. (2) Complaint, ¶ 79(b): "[LOA] had not been successful in penetrating the commercial market. In fact, most of the customers it had acquired were residential, not commercial." The allegedly fraudulent statements are that LOA had acquired "all of the high-end commercial Internet accounts of" Virtual Media Technologies, Inc., that this acquisition "accelerates [LOA's] penetration of the commercial market for bundled communications products and value added services," and that LOA "gain[s] a pre-qualified group of commercial accounts...." These statements are not actionable. (3) Complaint, ¶ 85(b): "LOA had not been successful in attracting and maintaining business clients. In fact, most of the clients it added through acquisitions were residential customers, not businesses." The allegedly fraudulent statements are that LOA, "[b]y providing business customers with the bundled communications and value added services they need to compete ... has quickly

become an integral partner to many of the fastest growing businesses in the Northeast. Through the continued expansion of these existing relationships, as well as through the addition of new business and residential customers, [LOA] is ideally positioned for continued accelerated growth," that LOA is "striving to become the leading single-source provider of voice, data, and video services to business and residential customers in each of our current markets," that LOA "offer[s] CLEC ..., D-CLEC ..., and ISP ... bundled services to residential and commercial customers," and that LOA's "objective is to become the leading single-source provider of voice, data, and video services to residential and small to medium sized business customers in each of our markets." These statements are not actionable. (4) Complaint, ¶ 111(d): "LOA's customer growth was primarily due to the addition of residential customers, not commercial clients." There are no allegedly fraudulent statements supporting this contention that relate to LOA's residential or commercial clients.

customers LOA had garnered as a result of the acquisitions (which Plaintiffs concede was in the tens of thousands).

■ The third challenged statement appears in a May 23, 2000 press release issued by LOA: "[O]ver the last 60 days, [LOA] has signed up 8,000 new commercial and SOHO voice customers. . . ." Def.App., Tab. 30. The objection is that, of these 8,000 new telephone customers, the "vast majority" were residential rather than SOHO or commercial, and that LOA made this statement merely to "boost its customer numbers." Complaint, ¶ 106. Defendants rejoin that SOHO customers are necessarily residential, because they operate from a residence. Def. Mem. at 12. This argument is unconvincing. The Court may reasonably infer that by characterizing their 8,000 new telephone customers as "commercial and SOHO," and omitting the word residential, Defendants wished to convey that they were augmenting their commercial customer base.[20] The statement is actionable.

■ The fourth challenged statement appears in a May 24, 2000 article reported in *The Providence Journal–Bulletin,* wherein Cornell is represented to have stated that he expected LOA's "customer count this year to hit 100,000." Def.App., Tab 31. Plaintiffs believe the statement is fraudulent because "Defendants' publicly reported customer counts were inflated because they included customers who had canceled their service with LOA, customers whose accounts were uncollectible, and

customers of PivotNet, who were not LOA customers." Complaint, ¶ 108(a). Even if accepted, however, this allegation has little, if any, relevance to Cornell's statement. Cornell's forecast that LOA would have 100,000 customers by the end of 2000 is a forward-looking statement and does not purport to be based on any factual information, whether or not properly calculated, available at that time. It is a naked prediction unsupported by any facts, and would not be deemed material by a reasonable investor. It is not actionable.

■ The fifth challenged statement appears in an August 9, 2000 press release: "[LOA is] [p]roviding service to 45,000 customers, a gain of 25% since March 31 and 50% for the six month period." Def.App., Tab 32. Plaintiffs' objection is that LOA's "publicly reported customer count was inflated with persons and businesses who did not pay their bills, were not receiving services, or were not LOA customers." Complaint, ¶ 115(b). A customer who does not pay his bills does not cease to become a customer; he is simply late in his payments.[21]

On the other hand, Plaintiffs' allegation, supported by an anonymous source, that "LOA's publicly disclosed customer count was never adjusted to remove subscribers who were no longer using LOA's services," Complaint, ¶ 31(a), is a more substantial claim. If true, it could affect materially (depending on the number of improperly included accounts) the number of custom-

---

20. This statement contrasts starkly with the type of statement discussed *supra* at II(C)(1)(c), in which Defendants were careful to include the word "residential" when commenting on the customers they were acquiring.

21. That some "new customers were added and billed without regard to their poor credit histories, creating a substantial risk of uncollectibility," Complaint, ¶ 36, is not relevant.

Customers with poor credit histories are still customers. Defendants did not represent that they had obtained only fabulously wealthy or uniformly credit-worthy customers. Similarly, that as of August, 2000 "approximately 1,200 'customers' had not paid their bills in over 90 days," does not mean that LOA committed fraud by including these late accounts in its customer count.

ers LOA could justifiably assert it had acquired.[22] This statement is actionable.

#### e. Alleged Misrepresentations Concerning the Type of Services That LOA Offered

■ The next subset of alleged fraud essentially concerns one statement that was repeated at the bottom of various 1999 press releases: "[LOA] is a ... 'CLEC' and ... 'IISP' providing local dial-tone, instate toll, long distance, high-speed Internet access and cable programming solutions. ..." See Complaint, ¶¶ 58, 65, 72, 78; Def.App., Tabs 5, 14, 17.

Counsel for Defendants conceded at oral argument that LOA was never able to offer cable programming at any time in the class period. Instead, Defendants argue that, given the context in which these statements were made (a few months after the IPO as LOA was in the process of acquiring ISPs) any reasonable investor ("[o]f course") would surely know that LOA "had not managed suddenly to transform itself into a full-fledged provider of Internet, telephone, and cable services." Def. Mem. at 14. This will not do. The statement is a representation of present and verifiable fact—LOA marketed itself and may have attracted investors because it represented itself as a company that could provide and was providing these services. If it could not or was not providing these services at the time it issued these statements, it may have committed actionable fraud. The statements are therefore actionable as a matter of law.[23]

#### f. Alleged Misrepresentations Concerning LOA's Quality of Service

■ This subset concerns a host of allegations that Defendants misrepresented the quality of their customer service as "great," "truly exceptional," "superior," the "best," and "world class." Complaint, ¶¶ 65, 72, 83, 90. Plaintiffs claim that these modifiers are materially false because LOA's customer service was poor, and cite various incidents of customer dissatisfaction. Complaint, ¶¶ 42–49. Plaintiffs also lump into this category the statements about LOA's ability to offer its customers a "unified billing structure" for the range of services the LOA customer was to receive. Complaint, ¶ 109.

Defendants point out that allegations of corporate mismanagement cannot support a claim for securities fraud, and the correlate principle that a failure to disclose purported mismanagement is likewise non-actionable. Def. Mem. at 15 (citing Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); Fitzer, 119 F.Supp.2d at 31).

The inquiry does not end here, however. Unlike in Santa Fe and Fitzer, Plaintiffs here allege that Defendants made statements describing the quality of customer service at LOA that they knew to be false, given the alleged management problems. The basis for the claims, therefore, is not the mismanagement, but the allegedly deceptive statements concerning the mismanagement:

---

**22.** Defendants fail adequately to address this argument: they conflate the allegation that 1,200 customers were delinquent in their payments with the allegation concerning improper inclusion of accounts that had already been terminated or were no longer receiving LOA services. See Def. Mem. at 13.

**23.** Defendants' argument that it is unreasonable to assume that LOA was a "full-fledged" telecommunications provider is unconvincing for other reasons. LOA stated that it could offer services that it now concedes it never became capable of providing. It was therefore under a duty to correct those misrepresentations.

In this case, plaintiff alleges that defendants mismanaged Bell [Savings Bank]. If this were all that plaintiff alleged, [Bell's receiver] would be correct in its position that only Bell has a claim against defendants and that plaintiff may assert that claim only by satisfying the prerequisites of a derivative action. But plaintiff alleges more than mismanagement. He alleges that defendants made affirmative representations inconsistent with the state of corporate affairs they knew to exist.

*Hayes v. Gross,* 982 F.2d 104, 106 (3rd Cir.1992); *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 365 (1st Cir. 1994) ("In this series of allegations, plaintiffs do more than simply identify management problems or point to statements that put a positive spin on the company's circumstances, without indicating how or why defendants should have known the descriptions were inaccurate. Rather, these paragraphs present a contrast between what company officials were hearing internally about their loan review effectiveness and the adequacy of their [allowance for loan losses], and what the company was telling the public *at the same time.*") (emphasis in original).

Plaintiffs allege numerous specific and pervasive examples of sub-par customer service at LOA, several of which they allege were remarked upon at various times by LOA employees: from routine customer complaints about service and dial tone interruption, to long delays in service set up, to insufficient resources to handle customer problems. *See, e.g.,* Complaint, ¶¶ 47–49. Defendants' representations of "great," "truly exceptional," "superior," the "best," and "world class" customer service, when matched against these allegedly widespread problems (of which Defendants do not deny they were aware), constitute actionable statements at this stage in the proceedings.

Likewise, the allegation in paragraph 109 that Paolo stated, in an interview with the Wall Street Transcript Corporation, that LOA was bundling all of its services into a unified bill is actionable. Plaintiffs claim that LOA was never able "to integrate the billing systems of the companies it acquired into one unified system." Complaint, ¶ 49. This is more than simply an allegation of undisclosed mismanagement: it charges that Paolo misrepresented what LOA could provide its customers in terms of service.

g. *Alleged Misrepresentations Concerning the Reasons for LOA's Losses*

██ The next group of alleged fraud deals with Defendants statements regarding the reasons for LOA's losses. Plaintiffs allege that Defendants' SEC filings and associated press releases were misleading because Defendants did not disclose that LOA's losses were in some measure attributable to "uncontrolled spending on office space," excessive salaries and bonuses for LOA's officers, and payment of Defendants' personal expenses. *See* Complaint, ¶¶ 50–51, 66(a), 94(a).

Plaintiffs do not present any arguments supporting the viability of these allegations. These allegations are not actionable as a matter of law: even if true, they represent precisely the type of naked allegations of corporate mismanagement that are not proscribed by the securities laws. *See Shaw,* 82 F.3d at 1206–07.

h. *Alleged Misrepresentations Concerning the Status of LOA's Relationship with Nortel*

██ Plaintiffs claim that Defendants misrepresented the status of LOA's ultimately failed relationship with Nortel. Specifically, Plaintiffs assert that Defen-

dants stated that the Nortel switch had gone "live" and was "established" but that it never actually functioned, because (according to an anonymous former network engineering manager at LOA) "the company never had the means to tie together the Nortel equipment it acquired into an operational network." Complaint, ¶¶ 43–45.

Typical of the Defendants' representations regarding the Nortel switch are the following, which appeared, respectively, in May 23, 2000 and August 9, 2000 press releases:

> [LOA] announced that its first Nortel DMS 500 switch went live.... The company will now commence moving its existing customer traffic over to its own switch which will lead to increased control over service quality, the ability to offer enhanced high speed product offerings, and greater per line profitability.

Def.App., Tab 30.

> The first Nortel switch and ten central offices in Rhode Island were established, in line with our installation plan. An additional 50 central offices in Maine, Massachusetts, New Hampshire, and Vermont will be on line by year-end.

Def.App., Tab 32.

Plaintiffs once again plead their allegations imprecisely, therefore, in characterizing Defendants' statements as representing that the Nortel switch had gone live and was established *in toto.* Defendants only stated that the "first Nortel switch" had gone live and been established. Nevertheless, Defendants' argument that its statements about the success of the Nortel switch were technically true at the time they were made, despite the almost immediate failure of that first switch and Defen-

dants' subsequent failure to inform the public that the entire Nortel operation never functioned, must be rejected. Given the alleged total failure of the Nortel switch, LOA was under a duty to correct the optimistic, factual impression conveyed by its statement that the first Nortel switch had succeeded and the natural inference that other Nortel switches were imminent.[24] *See Summa Four,* 93 F.3d at 992. Standing alone (as they do), these statements imply that the Nortel switch was proceeding on course. If it was not, investors had a right to know. The statements regarding the Nortel switch are actionable.

### i. *Alleged Misrepresentations Concerning LOA's Present and Future Revenues*

This subset of alleged fraud involves (1) LOA's overstated revenues as a result of alleged widespread billing errors at LOA, Defendants' refusal to write-off bad debts, and Defendants' refusal to establish a reserve for bad debts; and (2) Paolo's statement that he expected LOA to "continue its fast paced growth" and Cornell's prediction that LOA's year 2000 revenues would reach $15 million.

As to the allegations of overstatement of LOA's actual revenues, Defendants contend that they lack the requisite specificity to withstand dismissal because Plaintiffs neither set forth the amount nor estimate the magnitude of the alleged overstatement. Def. Mem. at 20–21.

The pivotal case on this issue, both parties agree, is *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72 (1st Cir.2002). There, the

---

**24.** Defendants' contention that they never represented that the Nortel switch had moved "beyond the test phase," Def. Mem. at 17, is irrelevant. Defendants never represented, in this context, that they were in a "test phase,"

so a potential investor would have had no way to know that, at the time of Defendants' statements, the Nortel switch was in an embryonic, non-viable, "test"-like stage.

plaintiff's "core claim [was] that the reported revenues and earnings in [the defendant's] financial statements were artificially inflated and that the statements contained omissions of material fact," and were not in compliance with GAAP. *Id.* at 79. With respect to the necessity of pleading precisely the amount of the alleged overstatement, the First Circuit's approach is one of context rather than of adherence to a bright-line rule: "[We do] not hold that a plaintiff, before discovery, must in every case allege the amount of overstatement of revenues and earnings in order to state a claim that undisclosed price protection schemes were fraudulent." *Id.* at 81 (citing *Greebel,* 194 F.3d at 204); *see In re Cabletron Systems, Inc.,* 311 F.3d 11, 32–33 (1st Cir.2002).

■ Here, the allegations that LOA improperly included revenues belonging to a company called PivotNet (which was not one of the ISPs LOA had acquired) as its own survive dismissal. Plaintiffs claim that CyberTours had, prior to its acquisition by LOA, an agreement in place with PivotNet whereby CyberTours would operate PivotNet's network in exchange for 80% of the revenue collected from PivotNet customers. Complaint, ¶ 41. Plaintiffs further allege that LOA "improperly recognized 100% of the revenues from PivotNet's customers, which amounted to an additional $30,000 to $45,000 per month in revenues for LOA." *Id.* Plaintiffs identify a "former vice president of technical services" and another "LOA vice president" as having notified Paolo and LOA COO Charles Cleary about this error, but claim that nothing was done to correct it. *Id.* These allegations are sufficiently particularized to meet the PSLRA pleading standards: given this context, it is not necessary, as Defendants contend, for Plaintiffs

to specify in the Complaint "when this occurred" (necessarily, it occurred within the class period, and after the time of the CyberTours acquisition) or "whether PivotNet ever made demand for a return of this alleged 20%." Def. Mem. at 22.

■ By contrast, the allegations concerning LOA's alleged failure to write-off bad debts (and its inclusion of "uncollectible" invoices as revenue) and its alleged internal billing errors are not actionable. Plaintiffs aver that "customers routinely complained about billing errors," that "approximately 50% of LOA's telephone customers had billing issues," and that these "billing issues were discussed at weekly formal executive meetings." Complaint, ¶¶ 33–34. There is no indication, nor even an approximation, of the amounts of the alleged inflation in revenue that these errors caused, and these allegations are inadequate to support an inference that Defendants fraudulently overreported their revenue as a result of these errors.

Similarly, Plaintiffs claim that "[e]arnings also were materially inflated as a result of defendants' failure to write off uncollectible receivables and establish and maintain an adequate bad debt reserve," because "LOA did not have an effective system in place to monitor and collect outstanding accounts receivables [sic]." Complaint, ¶ 36. The evidence supporting this contention is that "[a]ccounts receivable skyrocketed during the Class Period from $171,897 at June 30, 1999 to $1,880,178 at September 30, 2000," and that LOA "added and billed customers without regard to their poor credit histories." *Id.* This demonstrates nothing of consequence: "accounts receivable" does not mean "accounts overdue." [25] The fact

---

**25.** An "account receivable" is simply "[a]n account reflecting a balance owed by a debt- or; a debt owed by a customer to an enter-

that LOA's accounts receivable "skyrocketed" during the class period is entirely understandable: LOA was acquiring new customers at an exponential rate after its IPO.[26] Moreover, Plaintiffs fail to plead with requisite specificity the volume (or even approximate volume) of new customers for whom LOA failed properly to perform credit checks, or the effect that such a failure had on LOA's reported revenues.

The allegations of misstatements respecting LOA's future revenues also fail as a matter of law. Paolo's prediction of "continue[d] ... fast paced growth," which appears in a February 29, 2000 press release, is wholly subjective, non-actionable puffery. In addition, a clearly demarcated cautionary statement of the kind discussed earlier immediately follows it. Def.App., Tab 25. Likewise, Cornell's prediction of $15 million in revenues by the end of 2000 is just that—a naked and unsupported prediction, which is unactionable for the same reasons that Cornell's forecast of 100,000

customers (*supra* at II(C)(1)(d)) is not actionable.[27]

### 2. The Materiality of LOA's Stock Price Movements

Defendants assay one final attack on the materiality of the allegedly fraudulent misrepresentations and omissions. They contend that none of the allegations is material because LOA's stock price steadily declined throughout the putative class period; in fact, on November 20, 2000, the last day of the putative class period (and the day that LOA allegedly "finally revealed the extent of its problems," Complaint, ¶ 121), LOA's stock price rose. Therefore, the argument goes, investors were not deceived by the alleged misrepresentations and omissions, but were filtering them through the sieve of the rational and efficient market, steadily "sour[ing] on LOA" all the while; the disclosures of November 20, 2000 were of little moment to the market. Def. Mem. at 25–26; Def.App., Tab 1.[28]

---

prise for goods or services." *Black's Law Dictionary* 17 (7th ed.1999).

**26.** The "allowance for doubtful accounts" chart that Plaintiffs set forth at paragraph 141 of the Complaint is similarly immaterial. While it is true that the allowance for doubtful accounts, as a percentage of gross accounts receivable, did not keep pace in lockstep as time progressed, that discrepancy in bookkeeping is insufficient evidence of fraud rising to the requisite level of materiality. *Cf. Glassman v. Computervision Corp.*, 90 F.3d 617, 633 & n. 26 (1st Cir.1996) (omission found immaterial when it reflects a very minor, low percentage discrepancy).

**27.** Plaintiffs' claims that the statements respecting LOA's alleged overstatement of revenue violate sundry principles of GAAP require little comment. "Merely stating in conclusory fashion that a company's books are out of compliance with GAAP would not in itself demonstrate liability under section 10(b) or Rule 10b–5." *Cabletron*, 311 F.3d at 34; *Serabian*, 24 F.3d at 362. While it is true that allegations reflecting gross inflations (*i.e.*, "by

tens of millions of dollars per quarter," *see Cabletron*, 311 F.3d at 35) and the concomitant GAAP violations might, given the "total mix of information," be material, the magnitude (even when assessed proportionately) of alleged overstatement in this case hardly reaches such levels. Nevertheless, out of an abundance of caution, the Court holds that the alleged overstatements in revenue resulting from the PivotNet–CyberTours transaction may have constituted GAAP violations reflecting the level of materiality discussed in *Cabletron*. The allegations of GAAP violations as to this issue, therefore, are sufficient to withstand dismissal. All other alleged GAAP violations are not actionable.

**28.** This is essentially a defense premised on an absence of reliance. Plaintiffs have pled the fraud-on-the-market theory of reliance applicable to securities fraud actions; namely, that LOA traded its shares in a "well-developed and efficient market," Complaint, ¶ 142. This theory obviates the usual requirement that a plaintiff prove individual reasonable reliance, because it is assumed that the in-

The argument might have some force, but for the fact that LOA's stock only rose microscopically ($0.06 per share) on November 20, 2000, and is conceded to have plunged rather precipitately thereafter (falling 30% on November 21, 2000; 60% in eleven trading days; and 80% in twenty trading days). In response to these movements, Defendants tout the opinion of one expert that "[n]umerous empirical studies have confirmed the assumption of rapid price adjustment ... [all of which] found that new information is capitalized in stock prices no later than the day of release." Def. Mem. at 27 n. 10 (citing Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Law. 1, 18 n. 49 (1982) (citations omitted)).

It is certainly possible that this view will ultimately carry the day. The Court is loath, however, at this early stage, to reach legal conclusions regarding market reliance from ambiguous market history by engaging in its own projections about likely market movement, from day to day, during the putative class period and after November 20, 2000. These issues are factual disputes, which will likely require expert testimony about general market trends and the timing of the market's reaction to misrepresentations and/or omissions.[29] *See Basic*, 485 U.S. at 248 n. 28, 108 S.Ct. 978 (the Supreme Court did "not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market prices").[30]

### 3. Scienter

■ Because various of the Complaint's allegations are actionable,[31] and be-

---

vesting public "generally consider[s] most publicly announced material statements about companies, thereby affecting stock prices." *Basic*, 485 U.S. at 246–47 n. 24, 108 S.Ct. 978; *see also Shaw*, 82 F.3d at 1218 ("In [fraud-on-the-market] cases, the statements identified by plaintiffs as actionably misleading are alleged to have caused injury ... by dint of the statements' inflating effect on the market price of the security purchased.").

29. The observation of the Third Circuit that "when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock," is not to the contrary. *Oran v. Stafford*, 226 F.3d 275, 282 (3rd Cir.2000). In *Oran*, the defendant company's "share price rose by $3.00 during the four days after the [material] disclosure," and there was no allegation that it collapsed thereafter. *Id.* at 283; *cf. No. 84 Employer–Teamster Joint Council Pension Trust Fund v. American West Holding Corp.*, 320 F.3d 920, 947 (9th Cir.2003) (Tallman, J., dissenting) (the market's "collective yawn" in response to disclosures of allegedly material information, manifested by the stock's minuscule gains and losses, constituted a failure of plaintiffs' fraud-on-the-market

theory). Here, by contrast, there was no yawn: a fractional increase the day after the disclosures was rapidly followed by an exponential decrease from the second day forward.

30. Defendants rely heavily on *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir.2001), but (in addition to this Court's observation that *Zonagen's* reasoning on this point has not been adopted in the First Circuit) nothing in *Zonagen* suggests that a fraud-on-the-market theory necessarily fails where a material public disclosure is followed by a single day of minimal stock price increase, especially when it is followed by a plummet in stock price.

31. These include the allegations concerning misrepresentations about (1) LOA's overall market position, (2) LOA's characterization of 8,000 new telephone customers as commercial and SOHO, (3) LOA's allegedly inflated customer count as a result of its failure to remove customers who were no longer using its services, (4) the types of services LOA was able to offer, (5) the customer service LOA was capable of providing, (6) the status of the Nortel switch, and (7) the alleged overstatement of revenue resulting from the PivotNet–CyberTours transaction.

cause Plaintiffs' fraud-on-the-market theory is adequate to establish reliance, the Court proceeds with the *scienter* inquiry. The pleading requirements for allegations of *scienter* are set forth in the PSLRA:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). Although allegations of motive and opportunity are strong evidence of *scienter*, "merely pleading motive and opportunity, regardless of the strength of the inferences to be drawn of *scienter*, is not enough." *Greebel*, 194 F.3d at 197. Furthermore, "[t]he rule in this circuit has been to accept recklessness, as narrowly defined in ... two Seventh Circuit cases (*Sundstrand* and *Sanders*),[32] as a method of proving *scienter*." *Id.* at 199.

This Complaint pleads *scienter* adequately. Plaintiffs allege that Defendants falsely represented that LOA could provide services that it could not, such as cable service. LOA is alleged never to have been able to offer cable services, a fact which Defendants concede. The motive and opportunity are clear—Paolo and Cornell were in the top two positions of leadership at LOA, and wished to garner additional customers and business opportunities by representing LOA as a company that could offer a total package of bundled telecommunications services, when they knew it could not. Similarly, Paolo and Cornell are alleged to have known all too well that LOA was not at any time the "premier," "dominant," or "leading" telecommunications company in the Northeast. Plaintiffs allege that various former LOA employees (whose positions and employment time frame are identified) informed Paolo and Cornell, either directly or otherwise, that LOA's customer accounts were inflated with customers no longer using LOA services, that revenues were overreported as a result of the PivotNet CyberTours transaction, and that customer service at LOA was dreadful; Defendants are alleged to have made public statements wherein they repeatedly ignored, glossed over, or simply misrepresented or failed to disclose these problems. At the very least, this conduct, if true, demonstrates the type of willful recklessness recognized in this circuit as a sufficiently powerful indicium of *scienter* to survive dismissal.

### 4. Section 20(a)

Because the Court has determined that portions of the Amended Complaint survive dismissal, it likewise rules that Plaintiffs' cause of action under 15 U.S.C. § 78t(a) also survives.

### III. Conclusion

For the reasons stated, the Court finds that some of the allegations in the Complaint adequately plead violations of the federal securities laws, and therefore or-

---

32. *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977) (reckless conduct was defined as "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it."); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977) ("We believe 'reckless' in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence. We perceive it to be not just a difference in degree, but also in kind.").

ders that Defendants' Motion to Dismiss the Amended Complaint is DENIED.

IT IS SO ORDERED.