**Joel ROSEN, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**TEXTRON, INC., Lewis B. Campbell, John A. Janitz, Theodore R. French, and Terry D. Stinson, Defendants.**

**Leslie Turbowitz, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Textron, Inc., Lewis B. Campbell, John A. Janitz, Theodore R. French, and Terry D. Stinson, Defendants.**

**C.A. Nos. 02–190S, 02–264S.**

United States District Court, D. Rhode Island.

June 15, 2004.

---

William M. Kolb, Esq., Kaplan & Kolb, Inc., Barry J. Kusinitz, Esq., Providence, RI, Michael Behn, Esq., Futterman & Howard, Chicago, IL, Ira M. Press, Esq., Kirby, McInerney & Squire, LLP, New York, NY, for Plaintiffs.

John A. Tarantino, Esq., Adler, Pollock & Sheeran, Inc., Providence, RI, Peter J. Bechar, Esq., Mitchell A. Karlan, Esq., Gibson, Dunn & Crutcher, LLP, New York, NY, for Defendants.

## DECISION AND ORDER

SMITH, District Judge.

Plaintiffs, purchasers of Textron, Inc. ("Textron") common stock between October 19, 2000 and September 26, 2001 (the "Class Period"), bring this securities fraud class action[1] alleging that Textron and several of its senior executives (the "Individual Defendants")[2] (sometimes collectively, the "Defendants") fraudulently misled stock purchasers as to Textron's profitability during the Class Period in violation of the Securities and Exchange Act of 1934 (the "Exchange Act"). Specifically, Plaintiffs claim that certain accounting adjustments announced by Textron in September 2001 should have been made months earlier pursuant to Generally Accepted Accounting Principles[3] ("GAAP"). Plaintiffs claim that Defendants intentionally delayed making these adjustments hoping for a positive turn of events. As a result, Plaintiffs allege that persons who bought Textron stock during the Class Period paid an artificially inflated price. The Plaintiffs seek recovery on two counts: (1) violation of section 10(b) and Rule 10b–5 of the Exchange Act; and (2) violation of section 20(a) of the Exchange Act ("control person liability").

Following the usual course, Defendants have moved to dismiss the Plaintiffs' Amended Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Sections 21D and 21E of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b) (2000), for failure to state a claim and failure to plead with particularity. As grounds for their Motion to Dismiss, the Defendants contend that several of the Plaintiffs' allegations are not material under the PSLRA; and the Amended

---

1. Plaintiffs have not yet been certified as a class pursuant to Fed.R.Civ.P. 23. The putative class is alleged to consist of three benefit funds for the International Brotherhood of Teamsters, Local 710, as well as several individuals who purchased shares of Textron common stock during the Class Period.

2. The Consolidated Amended Complaint ("Amended Complaint") names Lewis B. Campbell ("Campbell"), the former Chairman of Textron's Board of Directors and Textron's Chief Executive Officer, Theodore R. French ("French"), Textron's Executive Vice–President and Chief Financial Officer, John A. Jan-

itz ("Janitz"), Textron's President and Chief Operating Officer, and Terry D. Stinson ("Stinson"), Chairman and Chief Executive Officer of Bell Helicopter Textron as defendants.

3. Generally Accepted Accounting Principles "are the conventions, rules, and procedures that define accepted accounting practices." *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984); *see In re Cabletron Sys., Inc.*, 311 F.3d 11, 34 (1st Cir.2002).

Complaint fails to allege sufficient facts to support a "strong inference" of scienter. After a careful review of the Amended Complaint, the Court determines that the Plaintiffs have alleged sufficient claims for which relief may be granted under the federal securities laws. Accordingly, the Defendants' Motion to Dismiss is denied.

## I. *Standard of Review*

In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court must take well-plead allegations in the complaint as true and make all reasonable inferences in favor of the plaintiff. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery. *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999).

It is well-settled that in a securities action, a court, in ruling on a motion to dismiss, may properly consider the "relevant entirety of a document integral to or explicitly relied upon in the complaint." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996). Moreover, even if such documents are not attached to the complaint, the parties may attach them to the motion to dismiss—and a court may consider them—without converting the motion into one for summary judgment. *See id.* This prevents a party from "excising an isolated statement from a document and importing it into the complaint, even though the surrounding context imparts a plainly non-fraudulent meaning to the allegedly wrongful statement." *Id.* at 1220.

## II. *Factual Background*[4]

Textron is a Delaware corporation with its principal place of business in Provi-

dence, Rhode Island. Am. Compl. ¶ 28. Textron is a multi-industry company with five business segments: Aircraft; Automotive; Fastening Systems; Industrial Products; and Finance. *Id.* These segments produce a wide range of products including commercial and military helicopters, light and mid-size business jets, fuel tanks, golf carts and utility vehicles, and other types of industrial equipment. *Id.* The Plaintiffs' fraud allegations focus on three different aspects of Textron's business operations; this Court will address each aspect separately.

## A. *The V–22 Osprey Tiltrotor Aircraft*

Textron's aircraft segment is divided into two divisions: Cessna Aircraft Company and Bell Helicopter Textron ("Bell"). *Id.* ¶¶ 28, 45. According to Textron's Form 10–K for the period ending December 30, 2000, Bell's revenues accounted for approximately 12%, 13%, and 14% of Textron's total revenues in 2000, 1999, and 1998, respectively. *Id.* ¶ 45. Before and during the Class Period, Bell (in a joint venture with The Boeing Company) was a prime contractor in both the development and production of an aircraft for the U.S. Department of Defense (the "DOD") known as the V–22 Osprey Tiltrotor ("Osprey" or "V–22"). *Id.* ¶ 46. The Osprey was designed with movable rotors that tilt upward to allow the aircraft to take-off vertically, but tilt forward once it is airborne. *Id.* This so-called "tiltrotor movement" allows the Osprey to take-off and land like a helicopter, but fly like an airplane. *Id.* At the beginning of the Class Period, the price of a single Osprey was estimated to be more than $80 million. *Id.*

In 1997, Bell began the Engineering and Manufacturing Development Stage

---

4.  Unless otherwise noted, the facts are drawn from the Amended Complaint.

("EMD") of its production of the Osprey. *Id.* ¶ 47. EMDs, common to large defense projects, authorize defense contractors to invest in production lines and supplier networks while their product is being designed. *Id.* During an EMD, manufacturers are often also authorized by the government to begin low-rate production of the product *before* field-testing commences. *Id.* In accordance with this general rule, Bell began low-rate production of the Osprey at this time. *Id.* ¶ 47.

By October 2000, low-rate production of the Osprey was generating substantial revenue for Textron—approximately $432 million in 2000 alone. *Id.* ¶ 48. By December 2000, Bell had manufactured nineteen V–22s for the DOD, and production of the V–22 was expected to switch from low-rate production to full-rate production. *Id.* ¶ 49. Under full-rate production, Bell would manufacture sixteen V–22s in 2001 worth $1 billion, as well as nineteen V–22s in 2002 and twenty-eight V–22s in 2003 for a total cost of $37 billion. *Id.*

However, during this time the Osprey program experienced some serious setbacks. On April 8, 2000, prior to the Class Period, an Osprey test-flight crashed near Tucson, Arizona killing all nineteen Marines onboard. *Id.* ¶ 66. Following the accident, the DOD grounded the remaining Ospreys pending an investigation of the cause of the accident. On July 27, 2000, the DOD issued a report stating that the cause of the accident stemmed from the Osprey's tendency to roll-over when it descended rapidly in helicopter mode. *Id.* ¶ 66. The Plaintiffs allege that a series of internal DOD and Textron communications reveal that, as a result of the April 2000 accident, the Defendants were aware that the Osprey program would incur additional costs and extended production schedules. *Id.* ¶ 69. According to the Plaintiffs, these communications also revealed the DOD's

dissatisfaction and concern with the state of the Osprey program. *Id.* ¶¶ 72–76. Despite these complications, the DOD made public representations that it was confident the Osprey would meet all the requirements for proceeding to full-rate production later that year. *Id.* ¶ 70. While Textron and Bell made no public comment on the state of the Osprey program, the Plaintiffs allege that the company was aware of the DOD's concerns. *Id.* ¶ 73. For example, on October 10, 2000, the president of Bell informed employees that Bell was "not meeting the expectations of its customers." *Id.*

On October 19, 2000, the beginning of the Class Period, Textron announced a 14% increase in earnings per share—its eleventh consecutive year of earnings improvement. *Id.* ¶ 77. Following this announcement, Textron's stock price rose from $43.37 per share to $55.37 per share over the next few weeks. *Id.*

On November 17, 2000, the DOD issued a report on the operational effectiveness of the Osprey. In that report, the DOD found that the Osprey was "not operationally suitable" due to lingering questions about its reliability and maintenance. For example, the report noted that the Marines' V–22s were only ready for flight 57% of the time. *Id.* ¶ 80. The report further revealed that the DOD was convinced that the Osprey had a tendency to roll-over during descent. *Id.* ¶ 81.

In early December 2000, due to concerns that the Osprey was not "operationally suitable," the DOD delayed its decision on whether to proceed to full-rate production of the Osprey until April 2001. *Id.* ¶ 87. The following week, on December 11, 2000, an Osprey crashed in North Carolina killing four Marines. *Id.* ¶ 88. As a result of the second crash in less than one year, the DOD again suspended all future Osprey flights and placed the program on hold

pending further investigation. *Id.* ¶ 89. The DOD convened a "Blue–Ribbon Panel" (the "Panel") to investigate the accidents and to determine whether production of the V–22s should continue. *Id.* In the wake of this news, Textron's stock price declined from $55.37 per share on November 7, 2000 to $41.43 per share on December 15, 2000. *Id.* ¶ 90.

One month later, on January 23, 2001, Textron released its financial results for the fourth quarter of 2000. The company reported a double-digit increase in earnings that highlighted the increased demand and improved productivity in Bell's helicopter business. Moreover, Textron specifically reported higher revenues on the V–22's production contract. On March 1, 2001, Textron released its expected first quarter results for 2001, which contributed (along with the previous results for the fourth quarter of 2000) to its stock price rising to $59.26 per share on March 8, 2001. *Id.* ¶ 106.

On April 19, 2001, the Panel concluded that the current Osprey design was not ready for full-rate production or operational use and recommended corrective action. *Id.* ¶ 111. The Panel recommended limiting production of the Osprey for at least the next two years "to a minimum sustaining level," rather than commencing full-rate production. *Id.* That same day, Textron released its first quarter financial results and again highlighted its increased profit in its Aircraft business segment. Its Form 10Q, however, also notified investors of the Panel's recommendation to slow production of the Osprey. *Id.* ¶ 114. Following the release of this information, Textron stock reached a price of $59.89 per share on June 7, 2001—the stock's highest per share price during the Class Period. *Id.* ¶ 114.

In late–2001 and early 2002, Textron reported the changes in the Osprey program in documents filed with the Securities and Exchange Commission ("SEC"): on November 2, 2001, Textron filed its Form 10Q with the SEC, which reported that "the [DOD] has approved continued low rate production for the V–22 to allow time for incorporation of the [Panel]'s recommendations. . . ." *Id.* ¶ 118. On March 14, 2002, Textron disclosed in its Form 10–K that it expected "to return the V–22 to flight in April 2002 for completion of extensive flight testing before returning to operational use in the third quarter of 2003." *Id.*

On September 26, 2001, Textron announced that it expected a third quarter loss of twenty-five cents per share. *Id.* ¶ 183. In light of this news, Textron stock dropped from $43.00 per share to $33.04 per share. *Id.* ¶ 185. The Plaintiffs allege that much of the loss announced on September 26, 2001 was due to a fifty-two cent per share adjustment against earnings that Textron attributed to lengthened production schedules and additional costs associated with design changes in the V–22 program. *Id.* ¶ 184.

The Plaintiffs' fraud allegations stem from the September 26, 2001 adjustment. During the Class Period, Textron followed the "percentage-of-completion" method of contract accounting. *Id.* ¶ 50. Under this method, a company is required to recognize both revenue and costs periodically during the life of the contract. *Id.* ¶¶ 50, 54. According to the Plaintiffs, companies utilizing the "percentage-of-completion" accounting method are required under GAAP to monitor and review progress on contracts on an ongoing basis in order to make accurate estimates of total contract cost, total contract revenues, and the extent of progress toward

contract completion.[5] *Id.* ¶ 53. If a company's performance under a contract is expected to deviate from original estimates, adjustments must be made to correct profit expectations or to recognize expected losses.

The Plaintiffs contend that, during the Class Period, the Defendants made numerous representations to the investing public, including financial statements filed with SEC, that were materially false and misleading in violation of the Exchange Act. Specifically, the Plaintiffs contend that the September 26, 2001 accounting adjustments should have been made in October 2000 when the Defendants became aware that additional costs and production setbacks would affect the Osprey program. Although the Defendants did not make the adjustments until September 2001, the Plaintiffs allege that the financial statements filed with the SEC throughout the Class Period made it appear that the adjustments had already been taken, which made the company's profit estimates appear better than was actually the case.

### B. *The H-1 "Super-Huey" Attack Helicopter*

During the Class Period, Bell also contracted with the DOD to upgrade 280 H-1 "Super-Huey" Attack Helicopters (the "H-1"). *Id.* ¶ 121. The upgrade contract called for installation of better software, improved transmissions and rotors, as well as more powerful engines and weaponry. *Id.* The H-1 contract was worth $4 billion and was regarded by Textron officials as "very important to Textron's future." *Id.* The Plaintiffs allege that Bell's H-1 program, like the V-22 program, encountered increased expenses, reduced profitability,

and a delayed production schedule as early as October 2000, but that Textron failed to adjust its accounting methods in light of these developments. *Id.* ¶ 120. As with the V-22, Textron announced a profit rate adjustment relating to the H-1 program on September 26, 2001. However, throughout the Class Period the Plaintiffs allege that Textron issued several positive financial results and public statements concerning the H-1 program that misled investors into believing the adjustment had already been made. *Id.* ¶ 122. The Plaintiffs contend that this adjustment should have occurred as early as October 2000, and that by failing to adjust its accounting at that time, Textron defrauded the investing public. *Id.* ¶ 120.

### C. *Omniquip*

Textron acquired Omniquip, an industrial equipment manufacturer, in 1999 at a cost of $477 million. *Id.* ¶ 224. At the time it acquired Omniquip, Textron recorded Omniquip's goodwill as an intangible asset. *Id.* In October 2000, Textron announced a restructuring program designed to address decreased profitability in its Omniquip subsidiary. *Id.* ¶ 239. As part of this restructuring program, Textron took a writedown (i.e., transferred a portion of the balance of an asset to an expense account due to a decrease in the value of the asset) for impaired goodwill at Omniquip on September 26, 2001. *Id.* The Plaintiffs contend that GAAP required Textron to take the goodwill impairment charge relating to Omniquip as early as October 2000 (the point in time when the revenue decline became apparent). *Id.* ¶¶ 226, 234.

**5.** In its Form 10-K filed with the SEC on March 14, 2001, Textron reported that its financial statements are prepared in compliance with GAAP. *Id.* ¶ 150. For purposes of this Motion to Dismiss, the Court must assume that Textron's accounting practices were required to comply with GAAP.

The Plaintiffs rely on Financial Accounting Standard ("FAS") 121, which requires that the reported value of long-term assets be reassessed whenever certain triggering events occur including: (1) a significant decrease in the market value of the asset; (2) a significant adverse change in legal factors or in the business climate that could affect the value of an asset; and (3) a current period operating cash flow loss combined with a history of operating or cash flow losses, or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue. Am. Compl. ¶ 234. The Plaintiffs also rely on FAS 5, which provides that an estimated loss from a contingency "shall be accrued by a charge to income" if: (1) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (2) the amount of the loss can be reasonably estimated. *Id.* ¶ 236.

The Plaintiffs contend that Textron's writedown in September 2001 actually was an attempt to conceal that Omniquip had lost $317 million during the Class Period. *Id.* ¶ 225. By delaying the writedown until September 2001, the Plaintiffs contend that Textron was able to mask Omniquip's loss in value. The Amended Complaint states that "by announcing restructuring charges along with Omniquip's problems, defendants misled the market to believe that any goodwill impairments had been recognized, when that was not true." *Id.* ¶ 248.

### III. *Securities Fraud: The Elements and Pleading Requirements*

#### A. *The Elements of Securities Fraud*

■ The elements of a securities fraud claim are set forth in numerous provisions of the Exchange Act, as well as Rules promulgated by the SEC. 15 U.S.C. § 78j(b) provides in pertinent part:

> It shall be unlawful for any person . . . [t]o use or employ in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to this statute, the SEC promulgated Rule 10b–5, which makes it unlawful to use deceptive tactics or devices in connection with the sale of securities. To establish liability under Rule 10b–5, a plaintiff must show "(1) that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading; (2) that defendants acted with scienter; (3) that either plaintiffs or the market relied on the misrepresentation or omission; and (4) resultant injury." *Geffon v. Micrion Corp.*, 249 F.3d 29, 34 (1st Cir.2001)(citing *Shaw*, 82 F.3d at 1216–17); *Scritchfield v. Paolo*, 274 F.Supp.2d 163, 170 (D.R.I.2003).

#### B. *The PSLRA's Heightened Pleading Standard*

■ In 1995, Congress enacted the PSLRA to stop the filing of strike suits in private securities litigation. *See* H.R. Conf. Rep. No. 104–369 at 31 (1995) (noting "significant evidence of abuse in private securities lawsuits," including "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer," and "the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle"), *reprinted*

*in* 1995 U.S.C.C.A.N. 730; *see Greebel v. FTP Software, Inc.,* 194 F.3d 185, 191 (1st Cir.1999). Prior to the enactment of the PSLRA, a securities fraud plaintiff was only required to meet the requirements of Fed.R.Civ.P. 9(b) by stating the circumstances allegedly amounting to fraud "with particularity." [6] The PSLRA augments Rule 9(b)'s particularity requirement and states, in pertinent part:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). Furthermore, the statements alleged to be misleading "must be misleading to a material degree." *Cabletron,* 311 F.3d at 27 (citing *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357, 361 (1st Cir.1994)).

▮ In addition to specifying with particularity each statement or representation alleged to be materially misleading, a complaint alleging securities fraud must also state with particularity facts that give rise to a "strong inference" of scienter. 15 U.S.C. § 78u–4(b)(2); *Cabletron,* 311 F.3d at 27. Accordingly, while a district court ruling on a motion to dismiss must contin-ue to make all inferences in a plaintiff's favor, the inferences relating to scienter must be strong ones. *See Cabletron,* 311 F.3d at 27; *Aldridge,* 284 F.3d at 82; *Kafenbaum v. GTECH Holdings Corp.,* 217 F.Supp.2d 238, 245 (D.R.I.2002). There is no particular test for determining when scienter is adequately plead. Instead, the First Circuit calls for a case-by-case analysis of the particular facts alleged to determine whether allegations are sufficient to support scienter. *See Aldridge,* 284 F.3d at 82 (citing *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000)); *Kafenbaum,* 217 F.Supp.2d at 245.

Notwithstanding the foregoing heightened requirements, this Court must remain mindful of the First Circuit's recent reminder that the strict pleading requirements of the PSLRA do not alter the standard of review for a motion to dismiss. *See Aldridge,* 284 F.3d at 78 (reaffirming the principle that, even under the PSLRA, a district court ruling on a motion to dismiss must draw all reasonable inferences from the allegations in the complaint in the plaintiff's favor).

With these principles in mind, the Court turns to the merits of the Defendants' argument that the Complaint fails to plead adequately a securities fraud claim.

### IV. *Analysis*

Motions to dismiss securities fraud complaints typically employ a two-front attack: (1) that the plaintiffs fail to allege materially misleading statements, or that they fail to set forth the allegedly misleading statements with particularity; and (2) that the plaintiffs fail to allege adequately facts showing a strong inference of scienter by the defendant. In this case, however, the Defendants' plan of attack is not so

---

**6.** Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constitut-ing fraud or mistake shall be stated with particularity."

straightforward. In their Motion to Dismiss, the Defendants primarily focus their challenge on scienter. *See* Mem. in Supp. Def. Motion to Dismiss at 17. Interspersed within the scienter argument, however, appears to be an underlying challenge to the materiality of several of the allegedly misleading statements. Therefore the Court will address the Defendants' objections to these statements separately from the scienter challenge.[7]

### A. *Identification of Materially Misleading Statements*

To survive the Defendants' Motion to Dismiss, the Plaintiffs' Amended Complaint must identify specific statements that were allegedly materially misleading.

■ After alleging that a statement or representation is untrue, "whether the statement is 'material' under § 10(b) is determined under the 'reasonable investor' standard: *i.e.,* the question asked is whether a reasonable investor would have viewed the nonpublic information as 'having significantly altered the total mix of information made available' to those making the investment decision." *Scritchfield,* 274 F.Supp.2d at 170 (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). The First Circuit has previously held that the materiality of a statement or omission is a question of fact "that should normally be left to a jury rather than resolved by the court on a motion to dismiss." *Cabletron,* 311 F.3d at 34; *see Lucia v. Prospect St. High Income Portfolio, Inc.,* 36 F.3d 170, 176 (1st Cir.1994).

The Amended Complaint describes statements (or omissions) that fall into three general categories of allegedly mis-

leading statements: (1) Textron's financial statements filed with the SEC; (2) direct statements made by Textron officials, either in press releases or in direct quotes in the media; and (3) statements made by stock analysts and journalists, allegedly echoing statements made to them by the Defendants.

#### 1. SEC Filings

Textron made its required filings with the SEC during the Class Period: its Form 10–Q for the quarter ended September 30, 2000; its Form 10–K for the fiscal year ended December 31, 2000; its Form 10–Q for the quarter ended March 31, 2001; its Form 10–Q for the quarter ended June 30, 2001; its Form 10–Q for the quarter ended September 29, 2001; and its Form 10–K for the fiscal year ended December 31, 2001.

The Plaintiffs allege that these public filings did not accurately reflect Textron's true financial position since Textron had failed to make the requisite accounting adjustments required by GAAP. Under SEC regulations, as the Plaintiffs note, filings that do not comply with GAAP "will be presumed to be misleading and inaccurate." Pl. Mem. at 19 (quoting 17 C.F.R. § 210.4–01(a)(1)); *see also Cabletron,* 311 F.3d at 34.

The First Circuit has warned that "[m]erely stating in conclusory fashion that a company's books are out of compliance with GAAP w[ill] not in itself demonstrate liability under section 10(b) or Rule 10b–5." *Cabletron,* 311 F.3d at 34. In *Cabletron,* the plaintiff alleged that, because it had engaged in various fraudulent revenue recognition practices, Cabletron filed financial statements with the SEC that did not reflect the company's true

---

**7.** The Defendants do not challenge the "materiality" of all of the allegedly misleading statements. Those statements that have not been challenged will be presumed actionable for purposes of this Motion.

earnings. Cabletron's SEC filings, by not reflecting the company's true earnings, violated GAAP and therefore were materially false and misleading in violation of Rule 10b–5. The district court dismissed the plaintiff's complaint, but on appeal, the First Circuit found that the plaintiff had adequately plead that fraudulent revenue recognition rendered the company's SEC filings materially misleading. To reach this conclusion, the court looked to the plaintiff's allegations that Cabletron's revenue was fraudulently inflated by tens of millions of dollars per quarter. "Accurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [a company]'s stock." *Id.* at 35. The court noted that "the nature of much of the alleged inaccuracy in earnings derives from systematic fraud, described in detail, that extends to completely fictitious sales." *Id.*

■ Here, as in *Cabletron,* the Plaintiffs have alleged more than general, unspecified allegations of accounting irregularities. The Plaintiffs contend that the SEC filings were materially misleading because they failed to account for the allegedly GAAP-required accounting adjustments associated with the change in the Osprey production schedule. Throughout the Amended Complaint, the Plaintiffs set forth in detail facts that they believe required accounting adjustments as early as October 2000, and the amount of revenue by which the financial statements were in error. Because these adjustments were not made when they should have been, the Plaintiffs allege that the SEC filings throughout the Class Period misled investors as to the earnings figures of the Company. Admittedly, there are no *Cabletron*-like deceptive sales schemes underlying the accounting allegations in this case. Instead, the allegations here are more in the nature of deliberate delay in making nec-essary adjustments in the hope that a positive turn of events would either eliminate the need to do so or mitigate the eventual adjustments. While the claims may eventually prove to lack merit, this Court finds that the Plaintiffs have adequately plead that Textron's failure to make its accounting adjustment as early as October 2000 rendered the financial statements filed with the SEC materially misleading.

### 2. Other Direct Public Statements

In addition to the SEC filings, the Plaintiffs allege that Textron and its executives made other direct statements to the public during the Class Period that were materially misleading.

Direct quotes of company officials in the news media may be attributed to the company for purposes of determining whether a representation or statement is materially misleading under Rule 10b–5 and the PSLRA. *See Cabletron,* 311 F.3d at 35; *Aldridge,* 284 F.3d at 79–80. After a review of the Amended Complaint, this Court located ten statements that fall into this category, five of which have been challenged by the Defendants in this Motion. *See* Def. Mem. at 30 n. 12.

First, on November 28, 2000 (a week after the Pentagon released its report finding the Osprey "not operationally suitable"), the Wall Street Transcript Corporation published an interview with Defendant Campbell that contained the following statements:

> Our global network of powerful market leading brands provides opportunities for growth across all of our segments. For example, Bell is the leader in a technology ... called tilt-rotor technology. It's a revolutionary aircraft that can lift like a helicopter and then fly like a turboprop. The V–22 ... is right on schedule to deliver eight tiltrotors this year and we have current requirements

from the U.S. armed forces to deliver 458 by 2014.

I see an even stronger organic growth story as we move forward because our businesses have gained a lot of momentum. The products I mentioned earlier, when they come to fruition, should increase our organic growth from 5% to 6% historically, to 7%, 8% and beyond.

Am. Comp. ¶ 133. The Defendants contend that these statements are vague, general statements of optimism on which no investor would rely. In so arguing, the Defendants are attempting to invoke the "puffery" defense. *See Scritchfield,* 274 F.Supp.2d at 172 ("Puffery has been defined as 'exaggerated, vague, or loosely optimistic statements about a company ....'") (quoting *In re Boston Technology, Inc. Sec. Litig.,* 8 F.Supp.2d 43, 54 (D.Mass.1998)). In *Scritchfield,* this writer discussed the often unclear "line of demarcation between puffery and actionable misstatement ...." 274 F.Supp.2d at 172. After a review of the relevant case law, the court determined that whether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made. *See id.* at 174–75. Campbell's representation that Textron's "global network of powerful market leading brands provides opportunities for growth all across our segments" cannot be segregated from his comments regarding the viability of the V–22 program, which follow immediately thereafter. Campbell provides detailed comment regarding the V–22 and its impact on the "organic growth" of the company over the next several years. Read in context, Campbell's discussion of the V–22 is more than mere puffery: it is a statement heralding the tilt-rotor technology, the size of the contract with the military, the "on schedule" delivery dates and the direct relation-ship between the V–22 and Textron's ability to increase its profit—an ability that was arguably weakened following the report of the Panel finding that the Osprey "not operationally suitable." Accordingly, the challenged statement is material.

Second, on October 19, 2000, Textron stated in a press release that "Bell remains on track to deliver eight V–22 tiltrotors this year." The Plaintiffs contend that this comment was materially misleading because, simply, it was incorrect. The Defendants argue that a statement that a company is "on track" is not an actionable representation. The Defendants also argue that the statement was not materially misleading because Textron did produce the eight V–22s as predicted. The First Circuit previously has held that a statement that a company was "basically on track" so "obviously fail[ed] to pose any 'substantial likelihood' of being 'viewed by the reasonable investor' ... 'as having significantly altered the total mix of information available'" that it is immaterial as a matter of law. *See Shaw,* 82 F.3d at 1219. However, such statements must be read in context, and the statement in this case is different than the statement in *Shaw.* Here, the statement that Osprey production was "on track" may have been materially misleading if it was untrue, because it reassured investors that production of a specific product of substantial financial importance to the company was on schedule, when the Defendants had knowledge that it was encountering significant problems. However, a January 2001 stock analyst report on Textron's Aircraft segment indicates that "Textron met its goal of producing 8 V–22s in 2000, although the recent delay prevented the delivery of the eighth aircraft." Joint Appendix (hereinafter "J.A.") 21 at 4. Despite difficulties in delivering the final aircraft, the stock analyst report legitimizes Textron's statements

that it believed production of those V–22s was "on track." Therefore, the Plaintiffs fail to state a securities fraud claim with respect to this statement.

■ Third, Textron issued several press releases during the Class Period that the Plaintiffs allege contained materially misleading representations. On November 29, 2000, April 19, 2001, and July 18, 2001 Textron issued press releases in which it made representations such as: "Bell Helicopter's revenues increased due to ... higher revenue on the V–22 production contract," and "our Aircraft and Finance segments achieved solid revenue and income growth". Am. Compl. ¶¶ 156, 164. Each of these press releases also contained the following boilerplate language:

> Forward-looking Information: Certain statements in this release are forward-looking statements, including those that discuss strategies, goals, outlooks or other non-historical matters; or project revenues, income, returns or other financial measures. These forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those contained in the statements ....

J.A., Tabs 8, 16, 32. Defendants contend that the statements detailed in the Plaintiffs' Amended Complaint are just such forward-looking statements and are therefore not actionable under the PSLRA. The PSLRA exempted certain forward-looking statements from securities fraud causes of action if "the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement ...." 15 U.S.C. §§ 77z–2(c)(1)(A)(i), 78u–5(c)(1)(A)(i); see Scritchfield, 274 F.Supp.2d at 177. As the Plaintiffs point

out, however, the forward-looking statement protection disclosure is not available for a representation of present fact because the statement is misleading when made. See Shaw, 82 F.3d at 1213. The allegedly misleading statements set forth in the press releases involve statements of either current or past earnings—not the type of financial information subject to different results based on unforeseen or unexpected circumstances. Accordingly, these statements are not exempt from liability under the PSLRA as forward-looking statements and therefore are actionable.

### 3. Third–Party Statements

■ The Defendants also challenge two statements made by third-parties. The first was published in an article in the Fort Worth Star–Telegram. In that article, the journalist, with attribution to a Textron spokesperson, wrote that "corporate efforts to cut costs and maintain profitability" were not required at Bell. Am Compl. ¶ 127. The Court finds this statement to be so general and unspecific that no reasonable investor could possibly have relied on it when making an investment decision. This statement is not actionable.

The second statement was contained in a January 30, 2001 financial report issued by Merrill Lynch Capital Markets. The report stated that "[Textron] remains very confident regarding the long term prospects of the V–22 and expects to get clearance by the end of 2001. Schedule delays resulting from the current grounding could potentially be offset by an accelerated schedule in 2002–2003." Am. Compl. ¶ 140. Even assuming this statement could be attributed to a representative of Textron (which has not been alleged), see Cabletron, 311 F.3d at 36–37, it is not actionable. Language that a company is "very confident" about "long term growth"

is precisely the type of expression of corporate optimism that courts have found to be immaterial. *See Shaw*, 82 F.3d at 1217–18; *see, e.g., Kafenbaum*, 217 F.Supp.2d at 250 (statement that a company "remains confident that our business is sound" is not actionable); *Colby v. Hologic, Inc.*, 817 F.Supp. 204, 211 (D.Mass. 1993) ("long term prospects are bright" is not actionable). Moreover, based on the facts alleged in the Amended Complaint, Textron's additional statements regarding the Osprey's production schedule and expectations for 2002–03 are not unreasonable based on the fact that a decision on whether to go to full-rate production was to be made several months later in April 2001. Consequently, the Merrill Lynch statements are not actionable securities fraud.

### B. *Scienter*

■ The major thrust of Defendant's Motion to Dismiss, is that the Amended Complaint fails to allege facts sufficient to permit a strong inference of scienter. Scienter is a state of mind indicating "either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." *Aldridge*, 284 F.3d at 82. "Scienter may be established by proving knowing misconduct on the part of the defendants . . . ." *Geffon*, 249 F.3d at 35 (citing *S.E.C. v. MacDonald*, 699 F.2d 47, 50 (1st Cir.1983)). With respect to allegations of scienter, the PSLRA requires that:

> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). As this Court indicated, *supra*, the First Circuit has rejected any rigid formula for determining when a strong inference of scienter has been plead, preferring instead to rely on a more "fact-specific approach" that proceeds case by case. *Aldridge*, 284 F.3d at 82; *see Greebel*, 194 F.3d at 196. Although unsupported or "catch-all" allegations of motive and opportunity alone are not sufficient to establish a strong inference of scienter, the First Circuit has "specifically rejected the contention that 'facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter.'" *Cabletron*, 311 F.3d at 39 (quoting *Greebel*, 194 F.3d at 197). "'[T]he plaintiff may combine various facts and circumstances indicating fraudulent intent—including those demonstrating motive and opportunity—to satisfy the scienter requirement.'" *Id.* (quoting *Aldridge*, 284 F.3d at 82).

#### 1. The V–22 Program

■ The Plaintiffs have adequately alleged a strong inference of scienter with respect to the V–22 program. The overarching allegation regarding the V–22 program is that the Defendants intentionally countered the disappointing setbacks relating to the V–22 with what the Plaintiffs contend were deceptively strong financial statements. In this Circuit, contentions of a similar ilk have been found sufficient to support a securities fraud complaint. *See, e.g., Cabletron*, 311 F.3d at 35; *Aldridge*, 284 F.3d at 80. The Amended Complaint sets forth several factual allegations that support a finding of a strong inference of scienter.

The Plaintiffs' core contention is that the Defendants intentionally delayed taking the accounting adjustments until September 2001 in violation of GAAP. Courts have widely held that GAAP violations are not

tantamount to securities fraud, and that GAAP violations, with nothing more, will not establish a strong inference of scienter. *See, e.g., In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 553 (6th Cir.1999); *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994); *In re Peritus Software Servs., Inc. Sec. Litig.,* 52 F.Supp.2d 211, 223 (D.Mass.1999). But this is not to say that a misapplication of accounting principles can never take on significant inferential weight in the scienter calculus. *See In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 635 (E.D.Va.2000). When the number, size, timing, nature, and context of the errors are considered, "the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter . . . ." *Id.* As the First Circuit noted in *Cabletron,* "[s]ignificant GAAP violations . . . 'could provide evidence of scienter.' " 311 F.3d at 39 (quoting *Greebel,* 194 F.3d at 203). " '[A]ccounting shenanigans' are among the characteristic types of circumstances which may demonstrate scienter for securities fraud." *Id.* (quoting *Geffon v. Micrion Corp.,* 249 F.3d 29, 36 (1st Cir.2001)); *see In re Peritus,* 52 F.Supp.2d at 224 (noting that violations of GAAP, in combination with other factors, may support a strong inference of scienter); *In re Ancor Comm., Inc., Sec. Litig.,* 22 F.Supp.2d 999, 1005 (D.Minn.1998)(same). The *MicroStrategy* Court described the impact of GAAP violations on the PSLRA scienter analysis aptly:

> Nor does the rule stand for the proposition that scienter cannot be inferred *at all* from [GAAP] allegations and that the

allegations are, therefore, *irrelevant* to the issue of scienter. . . . To put it differently, while it is true that it cannot be *strongly* inferred from bare allegations of a GAAP violation or a restatement of financials that a defendant acted recklessly, consciously, or intentionally, it is not true that *nothing* can be inferred from those facts at all or that '[s]pecific attributes of a GAAP violation may give rise to a stronger, or weaker, inference of scienter.'

115 F.Supp.2d at 635 (emphasis in original) (citation omitted).[8] These cases all say that GAAP violations, if accompanied by "something more," *see Cabletron,* 311 F.3d at 39, can satisfy the scienter requirement. The "something more" may include the egregious nature of the violation or a clear consciousness of wrongdoing. *See id.*

Defendants seek to portray the Amended Complaint as nothing more than accounting malpractice masquerading as securities fraud. Defendants contend that their accounting practices are industry standard "contract accounting"; that their application of these principles are GAAP compliant; and, to the extent that they are not, they do not establish the nefarious conduct claimed by the Plaintiffs, but merely the failure to apply accounting adjustments. A close review of the Amended Complaint reveals that the Plaintiffs' allegations are distinguishable from securities fraud actions based merely on an alleged violation of an industry practice. *See, e.g., Coates v. Heartland Wireless Comm., Inc.,* 26 F.Supp.2d 910, 921 (N.D.Tex.1998)

---

8. The Defendants argued in their papers and at oral argument that because this is not a financial restatement case, the Court cannot rely on restatement cases in ruling on this Motion. The Court acknowledges that *MicroStrategy* involved financial restatements, but nonetheless finds its discussion of GAAP violations and scienter to be persuasive. In *MicroStrategy,* the court focused on the repetitiveness and pervasiveness of the GAAP violations, as well as the simplicity of the accounting violation involved, in finding that scienter adequately had been plead. These principles apply to an analysis of GAAP violations regardless of whether a case also involves a restatement of financials.

(holding that the identification of GAAP as an industry practice, without more, is insufficient to plead scienter). Prior to September 2001, the Plaintiffs allege that the Defendants published statements (i.e., the SEC filings) regarding the financial status of the company when they knew that the statements were inaccurate.[9] *See Aldridge*, 284 F.3d at 83 ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.") (citing *Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001)). The Amended Complaint alleges in some detail the magnitude of the delayed adjustment as well as the pervasiveness of the alleged GAAP violations. The Plaintiffs allege that the Defendants should have accounted for the profit rate adjustments in October 2000, but instead waited nearly a year to make them. *See Cabletron*, 311 F.3d at 39 (noting that allegations of large-scale fraudulent practices over time "make it difficult to escape a strong inference of the type of recklessness concerning wrongdoing that amounts to scienter"). Moreover, the Plaintiffs allege that Textron and the Individual Defendants had detailed knowledge of the state of the Osprey program and the company's need to adjust its profit estimates to conform to GAAP in October 2000, but purposely delayed making the adjustment. It is reasonable to infer from the allegations that the Defendants knew they should have accounted for the losses associated with the V–22 contract in Textron's financial statements as early as October 2000.

Defendants argue that the accounting adjustments taken in September 2001 related only to the EMD contract and therefore were unrelated to the government's decision not to proceed with full-rate production. Accordingly, the Defendants posit that the accounting adjustments (or the failure to take them) cannot be connected to any intent to inflate Textron's profits. The Plaintiffs, however, are not alleging that the Defendants fraudulently accounted for the full-rate production contract itself. Instead, the alleged fraud involves the impact that delays in reaching full-rate production had on Textron's accounting for its existing contracts. The Amended Complaint states that Textron's "earnings release[s] and quarterly financial statement[s] falsely implied that all appropriate accounting adjustments had already been made to account for the increased costs and delays in production of the V–22, when, in fact, precisely the opposite was true." Am. Compl. ¶ 142(b), 148(b), 152(b), 161(b), 168(b). Additionally, the Amended Complaint makes other references to a delay in proceeding to full-rate production. *See, e.g., id.* ¶ 17 (denial of full-rate production meant continued low-rate production); *id.* ¶¶ 63, 86, 111 (stating that Osprey required extensive, costly redesign before it would be ready for full-rate production).

Whether the required accounting adjustments related only to development contracts or to full-rate production (or both) is a factual question that cannot be resolved in this Motion. The Plaintiffs' interpretation of the effect of the increased costs and delayed production on Textron's profit estimates is at least as plausible as that espoused by the Defendants. It would be

---

**9.** Courts have held that whether a defendant knowingly publishes misstatements is a factor to be considered when determining if there is a strong inference of scienter. *See, e.g., In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 147 (D.Mass.2001). This is to be distinguished from the altogether separate analysis of whether an alleged misstatement is actionable.

improper at the motion to dismiss phase—where this Court must accept the allegations contained in the Amended Complaint as true, and draw all inferences in the Plaintiffs' favor—to prefer the Defendants' explanation. *See Aldridge*, 284 F.3d at 79 ("It is here that the district court erred. The district court did not 'giv[e] plaintiff [ ] the benefit of all reasonable inferences' as it should have on a motion to dismiss, ... but appears to have drawn inferences in the defendant's favor.") (internal citation omitted); *In re Raytheon Sec. Litig.*, 157 F.Supp.2d at 147 (holding that it is improper to accept the defendants' interpretation of internal documents over the plaintiffs' interpretation in a motion to dismiss). Strict adherence to this standard is especially necessary in this case because of the inconsistency of the Defendants' descriptions of the accounting adjustments' relation to the production schedule. *Compare* Def. Mem. at 34 ("Bell's adjustments in the third quarter of 2001 related not to any V–22 production contract, but to a separate V–22 Engineering and Manufacturing Development Contract."), *with* J.A. 44 at 3 ("[T]he third quarter adjustments recognize what will now clearly be stretched out production schedules.").

The Defendants also attempt to defend Textron's accounting practices by noting that its independent auditors agreed with the accounting activity for the V–22 program. In *Aldridge,* the First Circuit dismissed just such an effort of a company to shift sole responsibility for its accounting practices to its accountants. *See* 284 F.3d at 83 ("The company argues that ... because its financial statements were audited by an independent accounting firm ... no inference of scienter [ ] can be drawn. We disagree .... To hold otherwise would shift to accountants the responsibility that belongs to the courts.").

The Defendants also attack the Plaintiffs' pleading of a strong inference of scienter based on a lack of allegations that the very survival of Textron hinged on the success of the V–22 program. *See Cabletron*, 311 F.3d at 39–40. While the Defendants may be correct that the V–22 program amounted to under 4% of Textron's annual revenue, the Plaintiffs cite to internal Textron documents that note the company's strong financial interest in the viability of the program. *See* Am. Compl. ¶ 20 ("there is no program more important to our future than the V–22 ..."). The 4% relating to the V–22 could easily be the difference between a profitable quarter for Textron, and an unprofitable one. This is an inference that must be drawn in the Plaintiffs' favor.

Accordingly, this Court must find that the Plaintiffs' Amended Complaint sufficiently alleges facts as to the Osprey to permit a strong inference of scienter.

### 2. The H–1

▮ The Plaintiffs also allege that, as with the V–22 program, "information to which defendants had access and a duty to monitor during the Class Period, made clear to [D]efendants that the H–1 contract was experiencing dramatically increased costs, delayed schedules, and reduced profitability expectations ...." Am. Compl. ¶ 120. As a result, the Plaintiffs contend that the Defendants "concealed key material through inaccurate cost estimating data" in order to mislead investors as to the financial state of Textron's H–1 production. *Id.*

The Plaintiffs fail, however, to specify the information available to Textron that would have required it to make accounting adjustments earlier than September 2001. The Plaintiffs refer the Court to a September 2001 internal memorandum at Bell that refers to "significant, unexpected cost

growth," but this fact alone does not support drawing a strong inference of scienter. It is undisputed that high costs were afflicting Bell at that time, but the mere fact that these troubles were evident in September 2001 does not mean that as of October 2000 they would have required accounting adjustments in order to comply with GAAP.[10] Accordingly, the Plaintiffs have merely plead "fraud by hindsight." *E.g., Meyer v. Biopure Corp.,* 221 F.Supp.2d 195, 207 n. 1 (D.Mass.2002) ("The law in this circuit also clearly prohibits plaintiffs from pleading fraud by hindsight, asserting that if the information was available on March 20, 2002, the defendants must have also known about it in May and August of 2001.").

### 3. Omniquip

The Plaintiffs further allege that Textron's reported financial results were materially overstated because it failed to record required writedowns for impairment in the value of goodwill[11] related to the Omniquip acquisition. *See* Am. Compl. ¶ 225. The Amended Complaint sets forth allegations showing that throughout the Class Period Textron underwent a restructuring that involved the closing of over twenty Omniquip plants. *See* Am. Compl. ¶ 228. Instead of taking the writedown for the impaired goodwill in October 2000 as part of the restructuring (when Textron allegedly knew of the need for writedown), the Plaintiffs allege that Textron waited until September 2001 to take the writedown in order to make it look as if the restructuring of Omniquip were successful. In other words, the Plaintiffs allege that GAAP required Textron to reassess the value of Omniquip's goodwill due to adverse changes in the business climate as early as October 2000, but that the company waited in order to avoid recording the restructuring and the writedown of goodwill from occurring at the same time (which would, presumably, have revealed the unprofitability of the Omniquip subsidiary). *Id.* ¶¶ 234–37.

The Amended Complaint fails to identify facts indicating that a writedown of the impaired goodwill was necessary in October 2000 when Textron initiated the restructuring. In order to show a need for a writedown of goodwill according to FAS 121, the Plaintiffs need to plead facts showing that, while restructuring efforts were taking place prior to September 2001, Textron estimated future cash flows for Omniquip to be less than the carrying amount. While the Amended Complaint does set forth in detail the GAAP standards that allegedly required the writedown to occur in October 2000, it fails to set forth in sufficient detail facts showing that Textron knew prior to September 2001 that the writedown was required, or that its estimated future cash flows for Omniquip would be less than the carrying amount. *See In re K–tel Int'l., Inc. Sec. Litig.,* 107 F.Supp.2d 994, 1000 (D.Minn. 2000) (dismissing complaint after finding that plaintiffs failed to plead facts indicating that the Defendants had an obligation to recognize an impairment loss under FAS 121). Without these facts, the Plaintiffs again have plead only fraud by hind-

---

10. The Plaintiffs refer the Court to a March 11, 2002 article that they contend evidences Textron's "inaccurate cost estimating data" with respect to the H–1, but this reference is inaccurate. The article refers to the Army's CH–47 Chinook program, and not the H–1.

11. Goodwill is "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase ...." Black's Law Dictionary 703 (7th ed.1999). In the purchase of a business, goodwill generally is the difference between the purchase price and the value of the assets acquired.

sight. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (" 'Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.' "); *Meyer*, 221 F.Supp.2d at 207 n. 1. Here, the Plaintiffs have relied exclusively on the timing of the write down, which is insufficient to state a claim for securities fraud under the PSLRA.

### C. *Pleading of Individual Defendants' Liability*

▮ With the exception of Stinson, the Defendants do not differentiate between Textron and the various Individual Defendants in their Motion to Dismiss. The Amended Complaint asserts that, under the so-called group pleading presumption, it is appropriate to impute the alleged misstatements and omissions to all of the individual Defendants as "collective actions." Am. Compl. ¶ 34. Under the group pleading presumption, "the plaintiff may impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers." *In re Raytheon Sec. Litig.*, 157 F.Supp.2d at 152; *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987).

The First Circuit recognizes "a very limited version of the group pleading doctrine for securities fraud." *Cabletron*, 311 F.3d at 40 (citing *Serabian*, 24 F.3d at 367–68). In *Cabletron*, the court noted that it is unclear to what extent the group pleading presumption continues to exist following the enactment of the PSLRA.[12] *Id.* Without addressing the survival of the presumption, the *Cabletron* court then analyzed whether the complaint stated a claim against the individual defendants. The court held that the complaint adequately stated securities fraud claims against the individual defendants, basing its conclusion on several grounds: the defendants were officers of the company that allegedly had access to information contrary to the company's public statements; the defendants made, or ratified, several of the alleged misstatements (such as signing both the Forms 10–K and Forms 10–Q); and the defendants made sales of their company stock. *See id.* at 41. In reaching its decision, the court also stressed the pre-discovery posture of the case. *See id.*

▮ The Amended Complaint adequately states a claim against Defendants Campbell, Janitz, and French. They were executive officers of Textron during the Class Period and are alleged, like the individual defendants in *Cabletron*, to have had access to the adverse undisclosed information. *See* Am. Compl. ¶ 36. Moreover, as was the case in *Cabletron*, Campbell, Janitz, and French signed the Forms 10–K that were filed with the SEC during the Class Period. *See id.* ¶ 149. Finally, the Amended Complaint alleges numerous public statements by Defendant Campbell that are alleged to be misleading. *See, e.g., id.* ¶ 133.

▮ Whether the Amended Complaint states a claim against Defendant Stinson is less clear. During the Class Period, Stinson was the Chief Executive Officer of Bell, a separately incorporated subsidiary of Textron. The Plaintiffs contend that Stinson's status as the CEO of Bell, and not as an officer of Textron, is a "slim distinction" that is unavailing to Stinson since the heart of the Amended Complaint

---

12. At least two district courts in this circuit have held that the group pleading presumption continues to exist following the enactment of the PSLRA. *See Kafenbaum*, 217 F.Supp.2d at 251 n. 4; *In re Raytheon Sec. Litig.*, 157 F.Supp.2d at 152–53 (collecting cases and holding that the group pleading presumption survives).

involves allegedly deceptive financial statements concerning Bell. This Court disagrees. While Stinson may have been attuned to the problems associated with the V–22, the Plaintiffs fail to assert that he participated in the allegedly fraudulent accounting practices. Unlike Campbell, Janitz, and French, Stinson was never an officer of Textron at any time during the Class Period and therefore never signed any of the SEC filings. *See, e.g.,* J.A. Ex. 28. And of the other alleged misstatements contained in the Amended Complaint, only two can be attributed to Stinson.[13] In order to hold Stinson liable for securities fraud, the Plaintiffs were required to plead facts claiming that he made a misrepresentation—not that others with whom he worked allegedly did so. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver,* 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)(holding that the Exchange Act does not include aider and abettor liability). Accordingly, this Court finds that the Plaintiffs have failed to state a securities fraud claim with respect to Stinson.[14]

### D. *Section 20(a)*

Because the Court has determined that portions of the Amended Complaint survive the Defendants' Motion to Dismiss, it also rules that the Plaintiffs' causes of action with respect to Campbell, Janitz, and French under 15 U.S.C. § 78t(a) survive.

### V. *Conclusion*

For the reasons stated, the Court finds that some of the allegations in the Complaint adequately plead violations of the federal securities laws, and therefore orders that Defendants' Motion to Dismiss the Amended Complaint is DENIED.

IT IS SO ORDERED.

---

13. Although the materiality of these statements was not challenged by the Defendants in their Motion to Dismiss, the Court notes that they are non-actionable statements of optimism. *See* Am. Compl. ¶¶ 154 ("I believe that the V–22 compares favorably to all other aircraft in its class as it relates to reliability and quality."); *id.* at 157 ("I would predict that there will be a decision later this year for low-rate production of the V–22.").

14. Even if this Court applied the group pleading presumption to the individual Defendants in this case, the outcome with respect to Stinson would be the same because he did not participate in the group-published documents such as the SEC filings. *See Cabletron,* 311 F.3d at 41 n. 16.